**FILED**

JUL 1 4 2006

July 14, 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

NH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF  ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

CRIMINAL COMPLAINT

v.

CASE NUMBER:

06 CR 0515

ESMAIIL GHAREKHANI and
NOSRATOLLAH TAJIK, aka
"Nasret Allah Tajek"

**UNDER SEAL**

MAGISTRATE JUDGE MASON

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

### Count One

Beginning in or about October 2005 and continuing until on or about July 12, 2006, at OakBrook Terrace, in the Northern District of Illinois, and elsewhere, defendants ESMAIIL GHAREKHANI and NOSRATOLLAH TAJIK did conspire with each other and others to knowingly and willfully export defense articles, namely night vision equipment, including:

(1)     Two ITT F7001 P Gen 3 Night Vision Weapon Sight, p/n 273570-6;
(2)     One  ITT Binocular Night Vision Goggle Gen 3, AN/PVS–23, F5050P, p/n 270733–6;
(3)     One ITT Night Vision Goggle Gen 3, AN/PVS–7, F5001P, p/n 270154–3;
(4)     Three  ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J;
(5)     One  ITT Night Vision Goggle Gen 3, F5016 6 0X p/n 275722–1;
(6)     One ITT Gen 3 Monocular Night vision Device, AN/PVS–14 (F6015 Series), p/n 274769–2; and
(7)     One ITT MX–10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image Intensifier Tube,

from the United States to Iran, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3) and (d) and 18 U.S.C. § 2.

**Count Two**

Beginning in or about October 2005 and continuing until on or about July 12, 2006, at OakBrook Terrace, in the Northern District of Illinois, and elsewhere, defendants ESMAIIL GHAREKHANI and NOSRATOLLAH TAJIK, did knowingly and willfully attempt to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom to Iran, night vision equipment, including:

(1)     Two ITT F7001 P Gen 3 Night Vision Weapon Sight, p/n 273570-6;
(2)     One  ITT Binocular Night Vision Goggle Gen 3, AN/PVS–23, F5050P, p/n 270733–6;
(3)     One ITT Night Vision Goggle Gen 3, AN/PVS–7, F5001P, p/n 270154–3;
(4)     Three  ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J;
(5)     One  ITT Night Vision Goggle Gen 3, F5016 6 0X p/n 275722–1;
(6)     One ITT Gen 3 Monocular Night vision Device, AN/PVS–14 (F6015 Series), p/n 274769–2; and
(7)     One ITT MX–10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image Intensifier Tube,

U.S. origin defense articles, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1) and (d) and 18 U.S.C. § 2.

I further state that I am a Special Agent of U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security, and that this complaint is based on the following facts:

**See attached Affidavit**

Continued on the attached sheet and made a part hereof:  __X__ Yes __ No

Special Agent MARK KNOBLOCK
U.S. Immigration and Customs Enforcement,
U.S. Department of Homeland Security

Sworn to before me and subscribed in my presence,

July 14, 2006, at Chicago, Illinois

MICHAEL T. MASON,
United States Magistrate Judge

STATE OF ILLINOIS          )
                           )    SS
COUNTY OF COOK             )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mark Knoblock, a Special Agent with the U.S. Department of Homeland

Security, U.S. Immigration and Customs Enforcement ("ICE"), having been duly sworn,

do hereby depose and state as follows:

1.      I am a Special Agent with the U.S. Department of Homeland Security, U.S.

Immigration and Customs Enforcement, Office of Investigations, Chicago, Illinois. I am

currently assigned to conduct investigations involving illegal exports and have served in

this position since November 2002. My current responsibilities include investigating the

illegal transfer of commodities, information, and services from the United States, which

are regulated by the U.S. Departments of State, Commerce, and the Treasury. Prior to my

appointment with ICE, I was a commissioned officer in the U.S. Air Force for

approximately four and one-half years. During that time, I was appointed as a Special

Agent with the U.S. Air Force Office of Special Investigations ("AFOSI"). While

working as a Special Agent with ICE and AFOSI, I have directed or otherwise been

involved in investigating violations of federal law including the illegal transfer of

commodities, information, and services from the United States, money laundering, drug

trafficking, and fraud against the government.

2.      I make this affidavit in support of a criminal complaint against Esmaiil

1

Gharekhani ("GHAREKHANI") and Nosratollah Tajik ("TAJIK"). I believe probable cause exists to believe that GHAREKHANI and TAJIK have: (1) conspired to knowingly and willfully export night vision equipment, defense articles, from the United States to the United Kingdom, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of the Arms Export Control Act codified at 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3); and (2) knowingly and willfully attempted to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom to Iran, night vision equipment, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1); and (3) aided and abetted these offenses in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(d) and 18 U.S.C. § 2.

    3.    I submit this affidavit for the limited purpose of obtaining a criminal complaint. This affidavit sets forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested criminal complaint. This affidavit does not contain every material fact that I have learned during the course of this investigation. The information contained in this affidavit is based on my own personal knowledge and investigative efforts and information provided to me by other United States law enforcement officials during the course of this investigation.

4.      The Arms Export Control Act ("AECA"), as codified at 22 U.S.C. § 2778, regulates the export from and import into the United States of defense articles and services. Specifically, 22 U.S.C. § 2778 authorizes the President to perform three functions: (1) to designate those items which shall be considered as defense articles and services, which will constitute the U.S. Munitions List; (2) to require licenses for the export of such articles and services; and (3) to promulgate regulations for the import and export of such articles and services.

5.      22 U.S.C. § 2778(b)(2) states, in pertinent part, that "[e]xcept as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter." Further, 22 U.S.C. § 2778 specifies that it is unlawful for individuals to engage in the business of brokering foreign or domestic defense articles with respect to their export or transfer from the United States without authorization in the form of a license issued by the United States Government. Brokering includes financing, transporting, freight forwarding, or taking any other action that facilitates the manufacture, export, or import of a defense article or defense service.

6.      The bulk of the night vision equipment that GHAREKHANI and TAJIK are attempting to acquire, are classified as defense articles and subject to the International

3

Traffic in Arms Regulations, and are categorized as significant military equipment on the U.S. Munitions List, category XII(c). As such, these items require authorization in the form of a license issued by DDTC for their lawful export from the United States.

7.    The U.S. Department of State, Directorate of Defense Trade Controls ("DDTC"), promulgates regulations under the AECA, which are known as the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130. The ITAR contains the U.S. Munitions List ("USML"), which sets forth twenty-one categories of defense articles and services that are subject to export licensing controls.  Unless an exemption applies, the ITAR requires a validated export license for the export of U.S. Munitions List articles and related technical data to all destinations. Specifically, section 127.1(a)(1) of the ITAR states, in pertinent part, that it is unlawful to " . . . reexport or retransfer or attempt to reexport or retransfer from one foreign destination . . . by anyone of any U.S. origin defense article . . . for which a license or written approval is required by this subchapter without first obtaining the required license." Further, section 127.1(a)(3) sets forth that it is illegal for anyone to "conspire to export, import, or cause to be exported, imported or reexported, any defense article . . . for which a license is required . . ." In addition, section 127.1(d) of the ITAR specifies that no person may willfully cause, or aid, or abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by 22 U.S.C. § 2778, or any regulation, license, approval, or order issued there under.

4

8.    This investigation has revealed, as more specifically set forth below, that GHAREKHANI and TAJIK have: (1) conspired to knowingly and willfully export night vision equipment, defense articles, from the United States to the United Kingdom, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls; (2) knowingly and willfully attempted to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom to Iran, night vision equipment, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls; and (3) aided and abetted these offenses.

9.    On or about October 21, 2005, a confidential source ("CS"), who owns and operates an internet based reselling business, received the following email from gharekhani@iag-co.com :

one of my customers want to order folowing:

1- termal (sic) binocoular
2-night vision gogels (sic)
3-night vision tools
4-laser range finder
5- laser aming gun (sic)

i think we may have 3,000,000 USD order, so i wanna to be your exclusive agent in iran, please repply to me as soon as possible.

best regards.
ghrekhani
tel:+98 21 22592267
fax:+98 21 22592251
cell:+98 912 324 5476

5

www.iag-co.com

10.    A review of the above email's header information revealed that it was sent from Internet protocol ("IP") address 80.253.135.198. A query of regional Internet registry information revealed that IP address 80.253.135.198 was assigned to the Internet service provider ISP AZADONLINE NETWORKS located in Tehran, Iran. A review of Internet domain records revealed that "iag-co.com" was registered to Amir Pournasserian of Tehran, Iran. Further, a review of the Internet website www.iag-co.com, revealed that this was an Internet site for the Industrial Automation Group located at Apt. 13, 3rd Floor, No. 337 Dolat Str., Pasdaran Ave., P.O. Box 19446, Tehran, Iran.

11.    On or about October 24, 2005, the CS sent a reply email to gharekhani@iag-co.com stating that "the export of products to Iran from the United States is currently restricted" but "that you may contact a local representative that may be able to assist..." In that email, the CS referred the recipient to an undercover ("UC") email address maintained by ICE.

12.    On or about October 25, 2005, the above mentioned email that was sent to the CS from gharekhani@iag-co.com on or about October 21, 2005 was forwarded to the ICE UC email address from the email address gharekhani@iag-co.com. On October 28, 2005, an ICE undercover agent ("UCA-1") placed a call to 98-9123245476, the number listed in the above email.[1] The call was answered by a male who identified himself as

_____

[1] This call was not recorded. However, all of the other calls outlined in this complaint affidavit were recorded by ICE undercover agents.

"GHAREKHANI."[2] UCA-1 asked GHAREKHANI if his client was in Iran, to which GHAREKHANI answered "yes." UCA-1 advised GHAREKHANI that due to the current U.S. sanctions against Iran, it was difficult to export to Iran. GHAREKHANI advised that it was not a problem and that goods could be sent to his office in Turkey and that he could receive them at that location. GHAREKHANI further advised UCA-1 that his client wanted to purchase at least $3 million worth of night vision equipment and other products.

13.    On or about October 29, 2005, GHAREKHANI sent another email to the ICE UC account requesting printed catalogs for a sales presentation to his customer in Iran. The email requested that the catalogs be sent to his attention at "no 13 no 337 dolat str, pasdaran, tehran, iran." The email also specified that GHAREKHANI had an office in Istanbul, Turkey that would be able to receive products from the United States.

14.    On November 4, 2005, an ICE undercover agent ("UCA-2") sent an email to GHAREKHANI from the ICE UC account and advised GHAREKHANI that the product catalogs that he wanted were ready to be sent, but asked GHAREKHANI if the catalogs should be sent to Turkey "since it is not legal to export to Iran."

15.    On or about November 11, 2005, GHAREKHANI sent an email to the ICE UC email account advising that he "had a [good] meeting with [his] customer" and that "they" were interested in [the] products; and that they wanted to purchase night vision

---

[2] The telephone conversations set forth in this affidavit between the ICE undercover agents and the defendants were primarily in English and secondarily in Arabic.

goggles, night vision binoculars, and laser range finders. In this email, GHAREKHANI asked if UCA-1 was sure that these products could be sold to him in Iran "(or [the] office in Turkey)." GHAREKHANI further requested "an agreement for start ur [sic] cooperation, I need an agreement fot [sic] start my presentation in Iran."

16.    On November 14, 2005, the UCA-2 sent an email to GHAREKHANI from the ICE UC account explaining that it was not legal to sell anything in Iran "without a government license." This email further stated that we "could not get a license to sell night vision items to Iran." The email continued by noting that "even if we sell to your Turkey office but they go to Iran, it is still not legal and we can go to jail."

17.    On or about December 16, 2005, GHAREKHANI sent the following in an email to the ICE UC account: " . . . in this step I think we need to prepare an agreement between us[.] I think we can have wide cooperation . . ."

18.    Between December 16, 2005, and January 20, 2006, GHAREKHANI communicated with the ICE UC account on four more occasions regarding the purchase of night vision equipment.

19.    On or about January 20, 2006, GHAREKHANI sent the following in an email to the ICE UC account:

> I start my negation with my costumer (sic), they need some sample and I will order these samples to you ASAP. But before that I need an agreement between me and you, and we need to review the process, where you can send these products, method of the payment and etc. I am waiting to your suggestion.

20.    On or about January 23, 2006, GHAREKHANI sent an email to the ICE UC

account explaining that "we start our business from now, we have start our order, for this step I want to order this part[.]" The following quantity and items were listed:

QUANTITY ITEM

| 3 | EO Tech AA 552.A65/1 [Holographic Weapon Sights] |
| 3 | ITT F7000 [Generation 3 Night Vision Weapon Sights] |
| 3 | ITT F7001 [Generation 3 Night Vision Weapon Sights] |
| 3 | ITT AN/PVS14 [Generation 3 Night Vision Monocular] |
| 3 | ITT 268549 [Purge Kit for Night Vision Goggles] |

21.    On January 26, 2006, UCA-2, as requested,  e-mailed a price quotation for the above listed items to GHAREKHANI from the ICE UC account quoting a price of $55,170.00.

22.    On January 26, 2006, GHAREKHANI and UCA-2 communicated via a Yahoo! Instant Messenger chat. During that exchange, GHAREKHANI related to UCA-2 that he had received the above-mentioned quote via email and that he would "send it to [his] costumer." GHAREKHANI also stated that he had a "big order" from his customer. GHAREKHANI conveyed that "Iran is not in good position in world now" and asked if we were "sure" that "we can do this [business]?" UCA-2 replied that "only if [we] are [careful]." GHAREKHANI responded with "ya[.] [S]o please help me[.]"

23.    On or about February 2, 2006, GHAREKHANI sent the following in an email to the ICE UC account:

As you told, we must be careful, it is very big risk, so I want you to help me to find a best way, as you know Iran have not good position in world now, and in other

9

hand this order is very big order. Tell me more about your friend;[3] I think in this step and in this business the price is not important, and if you sure about him, we can do this with him, but tell me more about it's price, for example if they want to ship this samples how much they will give for samples? And in final order how much they want to ship each package (including 50,000 USD or more)?

24.    On or about February 5, 2006, GHAREKHANI sent the following in an email to the ICE UC account: "What happen to you? I found ways for that, please reply to me, I want to order some products, we had started it." UCA-2 replied to GHAREKHANI from the UC account and requested that GHAREKHANI to "please tell me your way."

25.    On or about February 6, 2006, GHAREKHANI sent the following in an email to the UC account:

So sorry, I received your E-mail late, see you can send me packages in this ways:

1- You can send them to one of my partners' offices in Sweden.
2- You can send them to one of my partners' offices in Germany.
3- You can send them to one of my partners' offices in Istanbul (Turkey); it is better for me and my partners, if you sent it to turkey we can ship it easily.
I can suggest that 3 offices; what is your suggestion? Do you can send them to one of these countries? We can start and check this ways with small parties. We can test all of this ways and use all of them in final order.

26.    On February 7, 2006 GHAREKHANI identified his partner in Turkey (referred to in this affidavit as "Individual A") in a message sent via Yahoo! Instant Messaging. On February 7, 2006, GHAREKHANI also conveyed via instant messaging that Individual A told him (GHAREKHANI) to send the three EO Tech holographic

---

[3] Prior to this point in the negotiation, ICE had discussed with GHAREKHANI introducing another person (who was undercover operative) into the transaction in order assist with shipping, if necessary.

weapon sights to Turkey but to "write on the package its [sic] a gift with no value... e.g. worth is zero usd... no commercial good... so we have here no problem."

27.    On or about February 10, 2006, GHAREKHANI sent a purchase order for three EO Tech 550 AA HWS 552.A65/1 holographic weapon sights via email to the UC account, and provided a shipping address in Turkey. GHAREKHANI's email specified that this was his "partner address in Istanbul (Turkey)." The email continued "Please send me PI [pro forma invoice] to this address. I want to do EOTECH products with this address. He will have contact with you in this product. I will tell you more about him. I am waiting hearing from you ASAP."

28.    On or about March 12, 2006, GHAREKHANI sent the following in an email to the UC account:

> Our customer wants to buy ITT products and don't have any problem with your prices. Just one point which is our partner told us turkish goverment doesn't let these goods for importing and exporting, so we have to work with dubai; but as you know chicago-dubai is an known way for shipping so I suggest you to send a 2-pieces package to clearify the way after that ship more pieces. If you agree with me for shpping the package to dubai directly please notify me to send you the address in dubai.

29.    On or about March 15, 2006, GHAREKHANI provided, via an email sent to the UC account, the address for his "partner" in Dubai, United Arab Emirates.

30.    On or about April 12, 2006, GHAREKHANI sent, via email to the UC account, a purchase order dated April 12, 2006, for the following items and requested a pro forma invoice for these items including shipping costs to Dubai, U.A.E.:

11

- One ITT F6015PA NV Monocular, part number 274769-2
- Two ITT Modular Day/Night Generation 3 Weapon Sights, part number F7201J
- Two HYTECH Night Diver Underwater Night Vision Goggles
- Two ITT F7001P Generation 3 Night Vision Weapon Sights, part number 273570-6

31.    On or about May 2, 2006, GHAREKHANI sent a purchase order dated May

2, 2006, via facsimile to the UC undercover account for the following items for shipment

to Dubai, U.A.E.

- One EO Tech 552.A65/1 [Holographic Weapon Sight]
- One ITT NV F5050 [Generation 3 Binocular Night Vision Goggle]
- One ITT NV F5001 [Generation 3 Night Vision Goggle, AN/PVS-7]
- One ITT NV F7201 [Generation 3 Modular Day/Night Weapon sight]
- One ITT NV F5016 [Generation 3 Night Vision Goggle]
- One Leica Victor 5 [camera]
- One ITT 18 MM NV Tube MX-10130 [Generation 3 Image Intensifier Tube]

32.    In April and May 2006, respectively, UCA-2 sent  via email from the UC account,

pro forma invoices pursuant to GHAREKHANI's two above-mentioned purchase orders. The pro

forma invoices indicated that the following commodities would be sold to GHAREKHANI for a

total of $64,985.00 upon meeting the terms of the sale:

- One EO Tech 55O AA HWS 552.A65/1 Holographic Weapon Sight
- One ITT Gen 3 Monocular Night Vision Device, AN/PVS-14 (F6015 Series), p/n 274769-2
- Three ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J
- Two ITT F7001P Gen 3 Night Vision Weapon Sight, p/n 273570-6
- One ITT Binocular Night Vision Goggle Gen 3, AN/PVS-23, F5050P p/n    270733-6
- One ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P p/n 270154-3
- One ITT Night Vision Goggle Gen 3, F5016 6.0X p/n 275772-1
- One ITT Generation 3 Auto Gating Night Vision Image Intensifier tube

- Two HYTECH Night Diver Underwater Gen 2+ Night Vision Goggles[4]

33.    The terms of the pro forma invoices included the following:

PAYMENT TERMS: 80% cash in advance and 20% at or before delivery to the buyer's agent in the United States.

EXPORT RESTRICTIONS: The export of night vision, thermal imaging, and optical equipment is prohibited without a valid export license issued by the U.S. Department of State in accordance with the International Traffic in Arms Regulations. The sale, transfer, or shipment of any goods or technology from the U.S. is also subject to the authority of the U.S. Department of Commerce in accordance with the Export Administration Regulations. The sale, transfer, or shipment of goods or services from the U.S. to embargoed destinations such as Cuba, Iran, Sudan, and Syria is prohibited and is a federal crime. It is the buyer's responsibility to obtain all licenses for the use and or export of subject items and to ensure that the requirements of all U.S. and international laws and regulations are met.

34.    On or about May 6, 2006, GHAREKHANI sent the following in an email to the UC account: "Mr. Tajik is my partner in the UK who will be in contact with you from this time and you can ship the orders to his company in the UK. I think it is better for you to do this business with a British company. He will call you ASAP and you can finalize every thing with him."  As detailed below, "Mr. Tajik" was identified as Nosratollah Tajik ("TAJIK").

35.    On or about May 8, 2006 a telephone voice mail message was received on an ICE UC telephone line from an individual identifying himself as "TAJIK." TAJIK said that he was calling "on behalf of Mr. GHAREKHANI." TAJIK said that he was "supposed to be in the U.K." but that he was currently in Iran and could be reached at

---

[4] All of these items, with the exception of the first (the "Holographic Weapon Sight") are defense articles on the U.S. Munitions list and controlled by AECA.

13

98-9126725797.[5]

36.    On or about May 8, 2006, GHAREKHANI sent a request for quote via fax for a Helmet Mounted Infrared Thermal Imager. In the request GHAREKAHI related "As I wrote you in my last email, Mr. Tajik will pay the payments with a British company. Today he'll call you and you can ship the items to his company in UK for more security."

37.    On May 9, 2006, an email was sent to GHAREKHANI from the UC account asking GHAREKHANI how he knew TAJIK and if he had worked with him before. In a reply email from GHAREKHANI dated May 9, 2006, GHAREKHANI related that "he is one of my best friends and [partners], I know him for long times, he is in Iran now and please reply to his email and have contact with him." In a subsequent email, GHAREKHANI provided TAJIK's email address as acico@acico.co.uk.

38.    On May 11, 2006, UCA-1 telephoned GHAREKHANI at 98-2122618921. During this conversation, which was recorded, GHAREKHANI said that TAJIK was one of his best friends and that he had known him for a long time and that he has "more and more business with him in this time." GHAREKHANI also said that he told TAJIK everything about his business.

39.    On May 11, 2006, TAJIK telephoned UCA-1. During that conversation, which was recorded, TAJIK explained that GHAREKHANI had informed him about the business deal between GHAREKHANI and UCA-1 involving night vision equipment and

---

[5] "98" is the telephone country code for Iran.

14

that GHAREKHANI asked him [TAJIK] to "continue regarding [the business] transaction and shipping."

40.    On May 16, 2006, UCA-1 telephoned TAJIK in Iran at 98-9126725797. During that conversation, which was recorded, TAJIK said that he knew that the goods being sold to GHAREKHANI consisted of ITT night vision military equipment. UCA-1 then informed TAJIK that it was illegal to ship the items from the United States without a license and that UCA-1 was unable to get a license. TAJIK related that he could ship the items from the United Kingdom to Iran or that UCA-1 could send the items to Iran via Dubai, U.A.E. TAJIK explained that he had a "colleague" in Dubai and that he could send the items to Iran from Dubai. TAJIK said that he however "prefer[red] to deal...through the U.K.... to continue from the U.S. to U.K. and U.K. to Iran." When TAJIK was asked if he had ever received any U.S. products in the U.K. that he had shipped to Iran, he said, "Yes, yes, yes. Night vision plus the other equipment, I got it from the United States and... I did it last month and it was no problem..." TAJIK related that he shipped those items to Iran via Iran Airlines. When asked if the United States company that he had acquired the items from knew that he was going to ship them to Iran, TAJIK answered "No, no, they, they just know the goods, the instrument is going to the U.K.... and then in the U.K. we change the label... and we change the name and send it to Iran." TAJIK asked UCA-1 if he/she was a representative of the company ITT and UCA-1 related that he/she was not but that he/she had an inside connection at the company and that he/she had to pay the

15

person on the side to acquire the items. TAJIK advised that he understood by saying "good, yes, yes, understood." TAJIK said that he talked with GHAREKHANI and they agreed to open a letter of credit for payment to UCA-1 upon shipment of the items to the United Kingdom.

41.    On or about May 16, 2006, TAJIK sent an email to the UC account requesting a beneficiary name, account number, SORT code,[6] and address for the letter of credit. The email was sent from the email address "acicouk@yahoo.co.uk" and listed TAJIK's contact information as follows:

> Head Office:
> 12 Elahiyeh 3, Modarres Express way, Tehran Iran- Post Code: 19159
> T: +98(0)21 22612048 / F: 22005163 / E: info@acico.co.uk
> UK branch:
> 58 Beechfield Rise-Coxcoe- Durham DH6 4SB
> Tel/fax: 01913778390 & Mobile: 07986515758 / E: acico@acico.co.uk

42.    The ICE Attaché in London reviewed United Kingdom business incorporation records and learned that Nosratollah TAJIK is a director of the private limited company UK Islamic Direct Business Limited located in Harrow, Middlesex, United Kingdom. According to those records, TAJIK is an Iranian national born on November 19, 1953 and is an academic researcher residing at 58 Beech Field Rise, Coxhoe, County Durham DH6 4SB, United Kingdom. According to United Kingdom authorities, TAJIK does not have a United Kingdom passport but holds an Iranian passport, number R4131983. Further, an officer of the U.K. Identity and Passport Service

---

[6] A "SORT" code is an identifier to a particular bank including a branch office.

provided a photograph of TAJIK to the ICE Attaché in London and indicated that TAJIK
was in the United Kingdom as a student residing at 58 Beech Field Rise, Coxhoe, County
Durham DH6 4SB, United Kingdom. This address appeared in the footer to TAJIK's e-
mails sent to UCA-1 at the U.C. account.

43.    Agents from Her Majesty's Revenue and Customs ("HMRC") in the United
Kingdom conducted an open source investigation of news articles and learned a person
named Nosratollah TAJIK was previously the Iranian ambassador to Jordan.

44.    I obtained TAJIK's U.K. Identify and Passport Service's Photograph from
our London Attaché and compared the photograph to a picture contained on
www.iranian.com, from the Reuters news agency, of a person identified as the "Iranian
Ambassador to Jordan" as Nasret Allah Tajek, and I have learned that TAJIK held that
position from December 1999 through October 2003. The photograph appears to depict
the same person that is depicted in the photograph obtained from the U.K. Identity and
Passport Service. Finally, during a conversation between TAJIK and UCA-1 on June 16,
2006, TAJIK told UCA-1 that he had previously lived in Amman, Jordan. Based upon
this information, I believe that TAJIK was formerly the Iranian Ambassador to Jordan.

45.    On May 25, 2006, UCA-2 sent an email from the UC account to TAJIK
relating that "it is not legal to send the military items without a license and [it] is a very
big risk for an LC (referring to a letter of credit)." In a reply email dated May 26, 2006,
TAJIK related that he was not authorized "to give any money in advance. We like to buy

17

these instruments, and we can get more offers, but I have other options in European one

as well. If you are not happy with opening LC in any reason, so, the only way is to bring

instruments with you to London and get your money."

46.     On or about June 5, 2006, TAJIK sent an email to the UC account stating

the he had arrived back in the United Kingdom [from Iran] and that he was "ready to pay

and get the first order which Mr. Gharekhany asked before, in the earlist [sic] time

convenient..." The email also related that the "[p]lace of delivery could be either in

London or Newcastle."

47.     On or about June 5, 2006, TAJIK emailed the pro forma invoice dated May

3, 2006, that was previously emailed to GHAREKHANI from the UC account. In this

email, TAJIK asked "Would yopu [sic] inform me weather [sic] you can prepare this

order by THURSDAY? There is a shipment facility for Friday to Iran. If so please let me

know to prepare your money." In a reply email sent from the UC account, TAJIK was

asked if he had an agent in the United States that could receive the order. In a reply email,

TAJIK related "I am ready to get whole order and instruments which Mr. Gharekhani has

ordered and pay you money in cash. There is no downpayment and I don't have any agent

over there[.] It means you should bring instruments with you to deliver to me and get your

money."

48.     On or about June 7, 2006, GHAREKHANI sent an email to the ICE UC

account relating "We now ready to start our business; I will send cash for Mr. Tajik; so

18

finalize every thing with Mr. Tajik."

49.    On June 7, 2006, another ICE undercover Agent ("UCA-3") telephoned TAJIK in the United Kingdom at 44-1913778390. During the conversation, which was recorded, TAJIK said that one of his relatives was in the United Kingdom but he was going to travel back to Iran on Saturday June 10, 2006. TAJIK explained that he would be able to send "it" [the night vision equipment] back to Iran with his relative. TAJIK said that he was living Durham, which is close to New Castle, and that if UCA-3 came to London, he would travel by train to meet UCA-3 in London. TAJIK further explained that he "plan[ned] to bring [the] money from Iran." TAJIK also related that when he meets UCA-2, that they can "explore" other business "fields as well."

50.    In a follow-up email to UCA-3 dated June 7, 2006, TAJIK related "bring all equipments in the orders (Two PI) with you to London and you will get your money, by cash or bank draft. We will organize the kind of currency. If you like I can prepare a cheque, pay able [sic] to your account, so I need you account details."

51.    On or about June 26, 2006, GHAREKHANI sent an email to the UC account stating:

"I think we are going to start big business together. There is no problem, and the cash is ready and we are waiting to you final confirmation. So please send me final PI, and the time you can deliver these items to Dubai. I need originality documentation too. My customer needs it. Please send it via email to me ASAP."

19

52.    On June 27, 2006, an email was sent from the UC account to

GHAREKHANI confirming that the items would be brought to him in the United

Kingdom when he had the cash ready.

53.    On or about June 28, 2006, a fax was received at the UC account from

GHAREKHANI stating the following:

I am so please (sic) to inform you the cash is ready and we can start our business.
About the PIs, we want the PI 1478/1 for $51,155.00 and wanna ask you to scan the
original documentation and manuals and send them to me by Email to show our customer.
I confirm everything with Mr. Tajik in couple of days, after that Mr. Tajik will inform
you to get airline ticket.

Thanks a lot,
E. Gharekhani

54.    On July 3, 2006, UCA-2 sent, via facsimile, an invoice to TAJIK for

delivery and GHAREKHANI for billing for the following items:

--    1 EO Tech 550 AA HWS 552.A65/1 Holographic Weapons Sight (price
       $515);
--    1 ITT F7000P Gen 3 Night Vision Sight, p/n 272599-1 (price $6,990);
--    1 ITT F7001 P Gen 3 Night Vision Weapon Sight, p/n 273570-6 (price
       $6,990);
--    1 ITT Binocular Night Vision Goggle Gen 3, AN/PVS-23, F5050P, p/n
       270733-6 (price $5,015);
--    1 ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P, p/n 270154-3
       (price $3,975);
--    3 ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J (price $5,400
       per unit for a total price of $16,200);
--    1 ITT Night Vision Goggle Gen 3, F5016 6 0X p/n 275722-1 (price
       $5,120);
--    1 ITT Gen 3 Monocular Night vision Device, AN/PVS-14 (F6015 Series),
       p/n 274769-2 (price $3,350); and
--    1 ITT MX-10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image
       Intensifier Tube (price $3,000).

This invoice listed a total price of $51,155 for these items.  All of the items (except the Holographic Weapons Sight – the first item on the list) are defense articles listed on the U.S. Munitions List.  Along with this invoice, UCA-2 sent GHAREKHANI, via e-mail, scanned images of the covers of the product manuals for a number of the defense articles he intended to purchase.

55.    On July 5, 2006, the UCA-2 sent an e-mail to GHAREKHANI discussing the invoice and scanned images (described in paragraph 54, above).  UCA-2 again confirmed with GHAREKHANI that he would deliver the items sought by GHAREKHANI to TAJIK in the United Kingdom.

56.    According to DDTC records, the below listed commodities that GHAREKHANI and TAJIK are attempting to acquire are classified as defense articles and subject to the ITAR. More specifically, the following items are categorized as significant military equipment on the U.S. Munitions List, category XII(c), and as such, require authorization in the form of a license issued by DDTC for their lawful export from the United States.

- ITT Gen 3 Monocular Night Vision Device, AN/PVS-14 (F6015 Series), p/n 274769-2
- ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J
- ITT F7001P Gen 3 Night Vision Weapon Sight, p/n 273570-6
- ITT Binocular Night Vision Goggle Gen 3, AN/PVS-23, F5050P, p/n 270733-6
- ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P, p/n 270154-3
- ITT Night Vision Goggle Gen 3, F5016 6.0X, p/n 275772-1
- ITT MX–10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image Intensifier Tube

57.    On or about July 12, 2006, GHAREKHANI sent an email to the ICE UC account confirming that he was readying payment for the proposed shipment and that "his costumer [sic] is so glad to have business with us."

58.    On July 12, 2006, UCA-2 replied to GHAREKHANI and told him that UCA-2 would tell his supplier that the sale with TAJIK would be completed once GHAREKHANI confirmed that the payment was ready.  UCA-2 also held out the possibility of completing additional orders with GHAREKHANI.

59.    A query of records on file with DDTC, revealed that there have been no license applications to, nor licenses issued by, DDTC, with respect to the export or re-export of any goods, technology, or services to include brokering activities, by or on behalf of, GHAREKHANI, TAJIK, or any of their associated business entities.

60.    Based on all of the forgoing, I believe there is probable cause to believe that Nosratollah TAJIK and Esmaiil GHAREKHANI, and others, have: (1) conspired to knowingly and willfully export night vision equipment, defense articles, from the United States to the United Kingdom, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls, in violation of the Arms Export Control Act codified at 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3); (2) knowingly and willfully attempted to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom to Iran, night vision equipment, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls, in violation of 22

U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1); and (3) aided and abetted these offenses in

violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(d) and 18 U.S.C. § 2.

      FURTHER AFFIANT SAYETH NOT.

Special Agent Mark Knoblock
U.S. Immigration and Customs Enforcement,
U.S. Department of Homeland Security

SUBSCRIBED and SWORN before me
this 14th day of July 2006.

HONORABLE MICHAEL T. MASON
United States Magistrate Judge