# UNITED STATES DISTRICT COURT

**F I L E D**
August 30, 2006
AUG 3 0 2006
Michael T. Mason
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ESMAIIL GHAREKHANI and
NOSRATOLLAH TAJIK, aka
"Nasret Allah Tajek"

*b* AMENDED
CRIMINAL COMPLAINT

**06CR 0515**

CASE NUMBER:

**UNDER SEAL**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

**Count One**

Beginning in or about October 2005 and continuing until on or about <u>August 30, 2006</u>, at <u>OakBrook Terrace</u>, in the Northern District of Illinois, and elsewhere, defendants ESMAIIL GHAREKHANI and NOSRATOLLAH TAJIK did conspire with each other and others to knowingly and willfully export defense articles, namely night vision equipment, including:

    (1)    Two ITT F7001 P Gen 3 Night Vision Weapon Sight, p/n 273570-6;

    (2)    One ITT Binocular Night Vision Goggle Gen 3, AN/PVS–23, F5050P, p/n 270733–6;

    (3)    One ITT Night Vision Goggle Gen 3, AN/PVS–7, F5001P, p/n 270154–3;

    (4)    Three ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J;

    (5)    One ITT Night Vision Goggle Gen 3, F5016 6 0X p/n 275722–1;

    (6)    One ITT Gen 3 Monocular Night vision Device, AN/PVS–14 (F6015 Series), p/n 274769–2; and

    (7)    One ITT MX–10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image Intensifier Tube,

from the United States to Iran, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3) and (d) and 18 U.S.C. § 2.

**Count Two**

Beginning in or about October 2005 and continuing until on or about <u>August 30, 2006</u>, at <u>OakBrook Terrace</u>, in the Northern District of Illinois, and elsewhere, defendants ESMAIIL GHAREKHANI and NOSRATOLLAH TAJIK, did knowingly and willfully attempt to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom to Iran, night vision equipment, including:

    (1)    Two ITT F7001 P Gen 3 Night Vision Weapon Sight, p/n 273570-6;

    (2)    One ITT Binocular Night Vision Goggle Gen 3, AN/PVS–23, F5050P, p/n 270733–6;

    (3)    One ITT Night Vision Goggle Gen 3, AN/PVS–7, F5001P, p/n 270154–3;

    (4)    Three ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J;

    (5)    One ITT Night Vision Goggle Gen 3, F5016 6 0X p/n 275722–1;

    (6)    One ITT Gen 3 Monocular Night vision Device, AN/PVS–14 (F6015 Series), p/n 274769–2; and

    (7)    One ITT MX–10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image Intensifier Tube,

U.S. origin defense articles, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1) and (d) and 18 U.S.C. § 2.

I further state that I am a Special Agent of U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security, and that this complaint is based on the following facts:

**See attached Affidavit**

Continued on the attached sheet and made a part hereof:  __X__ Yes  __ No

                              Special Agent MARK KNOBLOCK
                              U.S. Immigration and Customs Enforcement,
                              U.S. Department of Homeland Security

Sworn to before me and subscribed in my presence,

 August 30, 2006, at <u>Chicago, Illinois</u>

MICHAEL T. MASON,
United States Magistrate Judge

STATE OF ILLINOIS   )
                      )    SS
COUNTY OF COOK    )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mark Knoblock, a Special Agent with the U.S. Department of Homeland
Security, U.S. Immigration and Customs Enforcement ("ICE"), having been duly sworn,
do hereby depose and state as follows:

1.     I am a Special Agent with the U.S. Department of Homeland Security, U.S.
Immigration and Customs Enforcement, Office of Investigations, Chicago, Illinois. I am
currently assigned to conduct investigations involving illegal exports and have served in
this position since November 2002. My current responsibilities include investigating the
illegal transfer of commodities, information, and services from the United States, which
are regulated by the U.S. Departments of State, Commerce, and the Treasury. Prior to my
appointment with ICE, I was a commissioned officer in the U.S. Air Force for
approximately four and one-half years. During that time, I was appointed as a Special
Agent with the U.S. Air Force Office of Special Investigations ("AFOSI"). While
working as a Special Agent with ICE and AFOSI, I have directed or otherwise been
involved in investigating violations of federal law including the illegal transfer of
commodities, information, and services from the United States, money laundering, drug
trafficking, and fraud against the government.

2.     I make this affidavit in support of a criminal complaint against Esmaiil

1

Gharekhani ("GHAREKHANI") and Nosratollah Tajik ("TAJIK"). I believe probable cause exists to believe that GHAREKHANI and TAJIK have: (1) conspired to knowingly and willfully export night vision equipment, defense articles, from the United States to the United Kingdom, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of the Arms Export Control Act codified at 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3); and (2) knowingly and willfully attempted to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom to Iran, night vision equipment, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1); and (3) aided and abetted these offenses in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(d) and 18 U.S.C. § 2.

3.    I submit this affidavit for the limited purpose of obtaining a criminal complaint. This affidavit sets forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested criminal complaint. This affidavit does not contain every material fact that I have learned during the course of this investigation. The information contained in this affidavit is based on my own personal knowledge and investigative efforts and information provided to me by other United States law enforcement officials during the course of this investigation.

4.     The Arms Export Control Act ("AECA"), as codified at 22 U.S.C. § 2778, regulates the export from and import into the United States of defense articles and services. Specifically, 22 U.S.C. § 2778 authorizes the President to perform three functions: (1) to designate those items which shall be considered as defense articles and services, which will constitute the U.S. Munitions List; (2) to require licenses for the export of such articles and services; and (3) to promulgate regulations for the import and export of such articles and services.

5.     22 U.S.C. § 2778(b)(2) states, in pertinent part, that "[e]xcept as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter." Further, 22 U.S.C. § 2778 specifies that it is unlawful for individuals to engage in the business of brokering foreign or domestic defense articles with respect to their export or transfer from the United States without authorization in the form of a license issued by the United States Government. Brokering includes financing, transporting, freight forwarding, or taking any other action that facilitates the manufacture, export, or import of a defense article or defense service.

6.     The bulk of the night vision equipment that GHAREKHANI and TAJIK are attempting to acquire, are classified as defense articles and subject to the International

3

Traffic in Arms Regulations, and are categorized as significant military equipment on the U.S. Munitions List, category XII(c). As such, these items require authorization in the form of a license issued by DDTC for their lawful export from the United States.

7.    The U.S. Department of State, Directorate of Defense Trade Controls ("DDTC"), promulgates regulations under the AECA, which are known as the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130. The ITAR contains the U.S. Munitions List ("USML"), which sets forth twenty-one categories of defense articles and services that are subject to export licensing controls.  Unless an exemption applies, the ITAR requires a validated export license for the export of USML articles and related technical data to all destinations. Specifically, section 127.1(a)(1) of the ITAR states, in pertinent part, that it is unlawful to " . . . reexport or retransfer or attempt to reexport or retransfer from one foreign destination . . . by anyone of any U.S. origin defense article . . . for which a license or written approval is required by this subchapter without first obtaining the required license."  Further, section 127.1(a)(3) sets forth that it is illegal for anyone to "conspire to export, import, or cause to be exported, imported or rexported, any defense article . . . for which a license is required . . ."  In addition, section 127.1(d) of the ITAR specifies that no person may willfully cause, or aid, or abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by 22 U.S.C. § 2778, or any regulation, license, approval, or order issued there under.

4

8.    This investigation has revealed, as more specifically set forth below, that GHAREKHANI and TAJIK have: (1) conspired to knowingly and willfully export night vision equipment, defense articles, from the United States to the United Kingdom, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls; (2) knowingly and willfully attempted to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom to Iran, night vision equipment, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls; and (3) aided and abetted these offenses.

9.    On or about October 21, 2005, it came to the attention of law enforcement authorities that the following e-mail (verbatim below) was sent to a U.S. e-mail address from gharekhani@iag-co.com:

one of my customers want to order folowing:

1- termal binocoular
2-night vision gogels
3-night vision tools
4-laser range finder
5- laser aming gun

i think we may have 3,000,000 USD order, so i wanna to be your exclusive agent in iran, please repply to me as soon as possible.

best regards.
ghrekhani
tel:+98 21 22592267
fax:+98 21 22592251
cell:+98 912 324 5476

www.iag-co.com

10.    A review of the above email's header information revealed that it was sent

from Internet protocol ("IP") address 80.253.135.198. A query of regional Internet

registry information revealed that IP address 80.253.135.198 was assigned to the Internet

service provider ISP Azadoline Networks located in Tehran, Iran. A review of Internet

domain records revealed that "iag-co.com" was registered to Amir Pournasserian of

Tehran, Iran. Further, a review of the Internet website www.iag-co.com, revealed that this

was an Internet site for the Industrial Automation Group located at Apt. 13, 3rd Floor,

No. 337 Dolat Str., Pasdaran Ave., P.O. Box 19446, Tehran, Iran.

11.    On or about October 24, 2005, a reply e-mail was sent to

gharekhani@iag-co.com stating that "the export of products to Iran from the United

States is currently restricted" but "that you may contact a local representative that may be

able to assist..." In that email, the CS referred the recipient to an undercover ("UC") email

address maintained by ICE.

12.    On October 28, 2005, an ICE undercover agent ("UCA-1") placed a call to

98-9123245476, the number listed in the above email.[1] The call was answered by a male

who identified himself as "GHAREKHANI."[2] UCA-1 asked GHAREKHANI if his client

---

[1] This call was not recorded. However, all of the other calls outlined in this complaint affidavit were recorded by ICE undercover agents.

[2] The telephone conversations set forth in this affidavit between the ICE undercover agents and the defendants were primarily in English and secondarily in Arabic.

was in Iran, to which GHAREKHANI answered "yes." UCA-1 advised GHAREKHANI

that due to the current U.S. sanctions against Iran, it was difficult to export to Iran.

GHAREKHANI advised that it was not a problem and that goods could be sent to his

office in Turkey and that he could receive them at that location. GHAREKHANI further

advised UCA-1 that his client wanted to purchase at least $3 million worth of night vision

equipment and other products.

13.    On or about October 29, 2005, GHAREKHANI sent another email to the

ICE UC account requesting printed catalogs for a sales presentation to his customer in

Iran. The email requested that the catalogs be sent to his attention at "no 13 no 337 dolat

str, pasdaran, tehran, iran." The email also specified that GHAREKHANI had an office in

Istanbul, Turkey that would be able to receive products from the United States.

14.    On November 4, 2005, an ICE undercover agent ("UCA-2") sent an email

to GHAREKHANI from the ICE UC account and advised GHAREKHANI that the

product catalogs that he wanted were ready to be sent, but asked GHAREKHANI if the

catalogs should be sent to Turkey "since it is not legal to export to Iran."

15.    On or about November 11, 2005, GHAREKHANI sent an email to the ICE

UC email account advising that he "had a [good] meeting with [his] customer" and that

"they" were interested in [the] products; and that they wanted to purchase night vision

goggles, night vision binoculars, and laser range finders. In this email, GHAREKHANI

asked if UCA-1 was sure that these products could be sold to him in Iran "(or [the] office

in Turkey)." GHAREKHANI further requested "an agreement for start ur [sic] cooperation, I need an agreement fot [sic] start my presentation in Iran."

16.    On November 14, 2005, the UCA-2 sent an email to GHAREKHANI from the ICE UC account explaining that it was not legal to sell anything in Iran "without a government license." This email further stated that we "could not get a license to sell night vision items to Iran." The email continued by noting that "even if we sell to your Turkey office but they go to Iran, it is still not legal and we can go to jail."

17.    On or about December 16, 2005, GHAREKHANI sent the following in an email to the ICE UC account: " . . . in this step I think we need to prepare an agreement between us[.] I think we can have wide cooperation . . ."

18.    Between December 16, 2005, and January 20, 2006, GHAREKHANI communicated with the ICE UC account on four more occasions regarding the purchase of night vision equipment.

19.    On or about January 20, 2006, GHAREKHANI sent the following in an email to the ICE UC account:

> I start my negation with my costumer [sic], they need some sample and I will order these samples to you ASAP. But before that I need an agreement between me and you, and we need to review the process, where you can send these products, method of the payment and etc. I am waiting to your suggestion.

20.    On or about January 23, 2006, GHAREKHANI sent an email to the ICE UC account explaining that "we start our business from now, we have start our order, for this step I want to order this part[.]" The following quantity and items were listed:

8

QUANTITY ITEM

| | |
|---|---|
| 3 | EO Tech AA 552.A65/1 [Holographic Weapon Sights] |
| 3 | ITT F7000 [Generation 3 Night Vision Weapon Sights] |
| 3 | ITT F7001 [Generation 3 Night Vision Weapon Sights] |
| 3 | ITT AN/PVS14 [Generation 3 Night Vision Monocular] |
| 3 | ITT 268549 [Purge Kit for Night Vision Goggles] |

21.    On January 26, 2006, UCA-2, as requested,  emailed a price quotation for

the above listed items to GHAREKHANI from the ICE UC account quoting a price of

$55,170.00.

22.    On January 26, 2006, GHAREKHANI and UCA-2 communicated via a

Yahoo! Instant Messenger chat. During that exchange, GHAREKHANI related to UCA-2

that he had received the above-mentioned quote via email and that he would "send it to

[his] costumer." GHAREKHANI also stated that he had a "big order" from his customer

[sic]." GHAREKHANI conveyed that "Iran is not in good position in world now" and

asked if we were "sure" that "we can do this [business]?" UCA-2 replied that "only if

[we] are [careful]." GHAREKHANI responded with "ya[.] [S]o please help me[.]"

23.    On or about February 2, 2006, GHAREKHANI sent the following in an

email to the ICE UC account:

> As you told, we must be careful, it is very big risk, so I want you to help me to find
> a best way, as you know Iran have not good position in world now, and in other
> hand this order is very big order. Tell me more about your friend;[3] I think in this
> step and in this business the price is not important, and if you sure about him, we

---

[3] Prior to this point in the negotiation, ICE had discussed with GHAREKHANI
introducing another person (who was undercover operative) into the transaction in order assist
with shipping, if necessary.

can do this with him, but tell me more about it's price, for example if they want to ship this samples how much they will give for samples? And in final order how much they want to ship each package (including 50,000 USD or more)?

24.    On or about February 5, 2006, GHAREKHANI sent the following in an email to the ICE UC account: "What happen to you? I found ways for that, please reply to me, I want to order some products, we had started it." UCA-2 replied to GHAREKHANI from the UC account and requested that GHAREKHANI to "please tell me your way."

25.    On or about February 6, 2006, GHAREKHANI sent the following in an email to the ICE UC account:

So sorry, I received your E-mail late, see you can send me packages in this ways:

1- You can send them to one of my partners' offices in Sweden.
2- You can send them to one of my partners' offices in Germany.
3- You can send them to one of my partners' offices in Istanbul (Turkey); it is better for me and my partners, if you sent it to turkey we can ship it easily.
I can suggest that 3 offices; what is your suggestion? Do you can send them to one of these countries? We can start and check this ways with small parties. We can test all of this ways and use all of them in final order.

26.    On February 7, 2006 GHAREKHANI identified his partner in Turkey (referred to in this affidavit as "Individual A") in a message sent via Yahoo! Instant Messaging. On February 7, 2006, GHAREKHANI also conveyed via instant messaging that Individual A told him (GHAREKHANI) to send the three EO Tech holographic weapon sights to Turkey but to "write on the package its [sic] a gift with no value... e.g. worth is zero usd... no commercial good... so we have here no problem."

27.    On or about February 10, 2006, GHAREKHANI sent a purchase order for

10

three EO Tech 550 AA HWS 552.A65/1 holographic weapon sights via email to the UC

account, and provided a shipping address in Turkey. GHAREKHANI's email specified

that this was his "partner address in Istanbul (Turkey)." The email continued "Please send

me PI [pro forma invoice] to this address. I want to do EOTECH products with this

address. He will have contact with you in this product. I will tell you more about him. I

am waiting hearing from you ASAP."

28.    On or about March 12, 2006, GHAREKHANI sent the following verbatim

in an email to the ICE UC account:

> Our customer wants to buy ITT products and don't have any problem with your
> prices. Just one point which is our partner told us turkish goverment doesn't let
> these goods for importing and exporting, so we have to work with dubai; but as
> you know chicago-dubai is an known way for shipping so I suggest you to send a
> 2-pieces package to clearify the way after that ship more pieces. If you agree with
> me for shpping the package to dubai directly please notify me to send you the
> address in dubai.

29.    On or about March 15, 2006, GHAREKHANI provided, via an email sent

to the UC account, the address for his "partner" in Dubai, United Arab Emirates.

30.    On or about April 12, 2006, GHAREKHANI sent, via email to the UC

account, a purchase order dated April 12, 2006, for the following items and requested a

pro forma invoice for these items including shipping costs to Dubai, U.A.E.:

> - One ITT F6015PA NV Monocular, part number 274769-2
> - Two ITT Modular Day/Night Generation 3 Weapon Sights, part number F7201J
> - Two HYTECH Night Diver Underwater Night Vision Goggles
> - Two ITT F7001P Generation 3 Night Vision Weapon Sights, part number
> 273570-6

11

31.    On or about May 2, 2006, GHAREKHANI sent a purchase order dated May

2, 2006, via facsimile to the UC undercover account for the following items for shipment

to Dubai, U.A.E.

- One EO Tech 552.A65/1 [Holographic Weapon Sight]
- One ITT NV F5050 [Generation 3 Binocular Night Vision Goggle]
- One ITT NV F5001 [Generation 3 Night Vision Goggle, AN/PVS-7]
- One ITT NV F7201 [Generation 3 Modular Day/Night Weapon sight]
- One ITT NV F5016 [Generation 3 Night Vision Goggle]
- One Leica Victor 5 [camera]
- One ITT 18 MM NV Tube MX-10130 [Generation 3 Image Intensifier Tube]

32.    In April and May 2006, respectively, UCA-2 sent, via email from the ICE

UC account, pro forma invoices pursuant to GHAREKHANI's two above-mentioned

purchase orders. The pro forma invoices indicated that the following commodities would

be sold to GHAREKHANI for a total of $64,985.00 upon meeting the terms of the sale:

- One EO Tech 55O AA HWS 552.A65/1 Holographic Weapon Sight
- One ITT Gen 3 Monocular Night Vision Device, AN/PVS-14 (F6015 Series), p/n 274769-2
- Three ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J
- Two ITT F7001P Gen 3 Night Vision Weapon Sight, p/n 273570-6
- One ITT Binocular Night Vision Goggle Gen 3, AN/PVS-23, F5050P p/n 270733-6
- One ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P p/n 270154-3
- One ITT Night Vision Goggle Gen 3, F5016 6.0X p/n 275772-1
- One ITT Generation 3 Auto Gating Night Vision Image Intensifier tube
- Two HYTECH Night Diver Underwater Gen 2+ Night Vision Goggles[4]

33.    The terms of the pro forma invoices included the following:

PAYMENT TERMS: 80% cash in advance and 20% at or before delivery to the buyer's

---

[4] All of these items, with the exception of the first (the "Holographic Weapon Sight") are defense articles on the U.S. Munitions list and controlled by the AECA.

agent in the United States.

EXPORT RESTRICTIONS: The export of night vision, thermal imaging, and optical equipment is prohibited without a valid export license issued by the U.S. Department of State in accordance with the International Traffic in Arms Regulations. The sale, transfer, or shipment of any goods or technology from the U.S. is also subject to the authority of the U.S. Department of Commerce in accordance with the Export Administration Regulations. The sale, transfer, or shipment of goods or services from the U.S. to embargoed destinations such as Cuba, Iran, Sudan, and Syria is prohibited and is a federal crime. It is the buyer's responsibility to obtain all licenses for the use and or export of subject items and to ensure that the requirements of all U.S. and international laws and regulations are met.

34.    On or about May 6, 2006, GHAREKHANI sent the following in an email to the UC account: "Mr. Tajik is my partner in the UK who will be in contact with you from this time and you can ship the orders to his company in the UK. I think it is better for you to do this business with a British company. He will call you ASAP and you can finalize every thing with him."  As detailed below, "Mr. Tajik" was identified as Nosratollah Tajik ("TAJIK").

35.    On or about May 8, 2006 a telephone voice mail message was received on an ICE UC telephone line from an individual identifying himself as "TAJIK." TAJIK said that he was calling "on behalf of Mr. GHAREKHANI." TAJIK said that he was "supposed to be in the U.K." but that he was currently in Iran and could be reached at 98-9126725797.[5]

36.    On or about May 8, 2006, GHAREKHANI sent a request for quote via fax for a Helmet Mounted Infrared Thermal Imager. In the request GHAREKAHI related "As

_____

[5] "98" is the telephone country code for Iran.

13

I wrote you in my last email, Mr. Tajik will pay the payments with a British company.
Today he'll call you and you can ship the items to his company in UK for more security."

37.    On May 9, 2006, an email was sent to GHAREKHANI from the UC
account asking GHAREKHANI how he knew TAJIK and if he had worked with him
before. In a reply email from GHAREKHANI dated May 9, 2006, GHAREKHANI
related that "he is one of my best friends and [partners], I know him for long times, he is
in Iran now and please reply to his email and have contact with him." In a subsequent
email, GHAREKHANI provided TAJIK's email address as acico@acico.co.uk.

38.    On May 11, 2006, UCA-1 telephoned GHAREKHANI at 98-2122618921.
During this conversation, which was recorded, GHAREKHANI said that TAJIK was one
of his best friends and that he had known him for a long time and that he has "more and
more business with him in this time." GHAREKHANI also said that he told TAJIK
everything about his business.

39.    On May 11, 2006, TAJIK telephoned UCA-1. During that conversation,
which was recorded, TAJIK explained that GHAREKHANI had informed him about the
business deal between GHAREKHANI and UCA-1 involving night vision equipment and
that GHAREKHANI asked him [TAJIK] to "continue regarding [the business] transaction
and shipping."

40.    On May 16, 2006, UCA-1 telephoned TAJIK in Iran at 98-9126725797.
During that conversation, which was recorded, TAJIK said that he knew that the goods

14

being sold to GHAREKHANI consisted of ITT night vision military equipment. UCA-1 then informed TAJIK that it was illegal to ship the items from the United States without a license and that UCA-1 was unable to get a license. TAJIK related that he could ship the items from the United Kingdom to Iran or that UCA-1 could send the items to Iran via Dubai, U.A.E. TAJIK explained that he had a "colleague" in Dubai and that he could send the items to Iran from Dubai. TAJIK said that he however "prefer[red] to deal...through the U.K.... to continue from the U.S. to U.K. and U.K. to Iran." When TAJIK was asked if he had ever received any U.S. products in the U.K. that he had shipped to Iran, he said, "Yes, yes, yes. Night vision plus the other equipment, I got it from the United States and... I did it last month and it was no problem..." TAJIK related that he shipped those items to Iran via Iran Airlines. When asked if the United States company that he had acquired the items from knew that he was going to ship them to Iran, TAJIK answered "No, no, they, they just know the goods, the instrument is going to the U.K.... and then in the U.K. we change the label... and we change the name and send it to Iran." TAJIK asked UCA-1 if he/she was a representative of the company ITT and UCA-1 related that he/she was not but that he/she had an inside connection at the company and that he/she had to pay the person on the side to acquire the items. TAJIK advised that he understood by saying "good, yes, yes, understood." TAJIK said that he talked with GHAREKHANI and they agreed to open a letter of credit for payment to UCA-1 upon shipment of the items to the United Kingdom.

15

41.    On or about May 16, 2006, TAJIK sent an email to the UC account

requesting a beneficiary name, account number, SORT code,[6] and address for the letter of

credit. The email was sent from the email address "acicouk@yahoo.co.uk" and listed

TAJIK's contact information as follows:

> Head Office:
> 12 Elahiyeh 3, Modarres Express way, Tehran Iran- Post Code: 19159
> T: +98(0)21 22612048 / F: 22005163 / E: info@acico.co.uk
> UK branch:
> 58 Beechfield Rise-Coxcoe- Durham DH6 4SB
> Tel/fax: 01913778390 & Mobile: 07986515758 / E: acico@acico.co.uk

42.    The ICE Attaché in London reviewed United Kingdom business

incorporation records and learned that Nosratollah TAJIK is a director of the private

limited company UK Islamic Direct Business Limited located in Harrow, Middlesex,

United Kingdom. According to those records, TAJIK is an Iranian national born on

November 19, 1953 and is an academic researcher residing at 58 Beech Field Rise,

Coxhoe, County Durham DH6 4SB, United Kingdom. According to United Kingdom

authorities, TAJIK does not have a United Kingdom passport but holds an Iranian

passport, number R4131983. Further, an officer of the U.K. Identity and Passport Service

provided a photograph of TAJIK to the ICE Attaché in London and indicated that TAJIK

was in the United Kingdom as a student residing at 58 Beech Field Rise, Coxhoe, County

Durham DH6 4SB, United Kingdom.  This address appeared in the footer to TAJIK's

emails sent to UCA-1 at the ICE U.C. account.

---

[6] A "SORT" code is an identifier to a particular bank including a branch office.

43.    Agents from Her Majesty's Revenue and Customs ("HMRC") in the United Kingdom conducted an open source investigation of news articles and learned a person named Nosratollah TAJIK was previously the Iranian ambassador to Jordan.

44.    I obtained TAJIK's U.K. Identify and Passport Service's photograph from the Ice Attaché in London, England and compared the photograph to a picture contained on www.iranian.com, from the Reuters news agency, of a person identified as the "Iranian Ambassador to Jordan" as Nasret Allah Tajek, and I have learned that TAJIK held that position from December 1999 through October 2003.  The photograph appears to depict the same person that is depicted in the photograph obtained from the U.K. Identity and Passport Service.   Finally, during a conversation between TAJIK and UCA-1 on June 16, 2006, TAJIK told UCA-1 that he had previously lived in Amman, Jordan. Based upon this information, I believe that TAJIK was formerly the Iranian Ambassador to Jordan.

45.    On May 25, 2006, UCA-2 sent an email from the ICE UC account to TAJIK relating that "it is not legal to send the military items without a license and [it] is a very big risk for an LC" (referring to a letter of credit).  In a reply email dated May 26, 2006, TAJIK related that he was not authorized "to give any money in advance. We like to buy these instruments, and we can get more offers, but I have other options in European one as well. If you are not happy with opening LC in any reason, so, the only way is to bring instruments with you to London and get your money."

17

46.    On or about June 5, 2006, TAJIK sent an email to the ICE UC account stating the he had arrived back in the United Kingdom [from Iran] and that he was "ready to pay and get the first order which Mr. Gharekhany asked before, in the earlist [sic] time convenient..." The email also related that the "[p]lace of delivery could be either in London or Newcastle."

47.    On or about June 5, 2006, TAJIK emailed the pro forma invoice dated May 3, 2006, that was previously emailed to GHAREKHANI from the ICE UC account. In this email, TAJIK asked "Would yopu [sic] inform me weather [sic] you can prepare this order by THURSDAY? There is a shipment facility for Friday to Iran. If so please let me know to prepare your money." In a reply email sent from the UC account, TAJIK was asked if he had an agent in the United States that could receive the order. In a reply email, TAJIK related "I am ready to get whole order and instruments which Mr. Gharekhani has ordered and pay you money in cash. There is no downpayment and I don't have any agent over there[.] It means you should bring instruments with you to deliver to me and get your money."

48.    On or about June 7, 2006, GHAREKHANI sent an email to the ICE UC account relating "We now ready to start our business; I will send cash for Mr. Tajik; so finalize every thing with Mr. Tajik."

49.    On June 7, 2006, another ICE undercover Agent ("UCA-3") telephoned TAJIK in the United Kingdom at 44-1913778390. During the conversation, which was

18

recorded, TAJIK said that one of his relatives was in the United Kingdom but he was going to travel back to Iran on Saturday June 10, 2006. TAJIK explained that he would be able to send "it" [the night vision equipment] back to Iran with his relative. TAJIK said that he was living Durham, which is close to New Castle, and that if UCA-3 came to London, he would travel by train to meet UCA-3 in London. TAJIK further explained that he "plan[ned] to bring [the] money from Iran." TAJIK also related that when he meets UCA-2, that they can "explore" other business "fields as well."

50.    In a follow-up email to UCA-3 dated June 7, 2006, TAJIK related "bring all equipments in the orders (Two PI) with you to London and you will get your money, by cash or bank draft. We will organize the kind of currency. If you like I can prepare a cheque, pay able [sic] to your account, so I need you account details."

51.    On or about June 26, 2006, GHAREKHANI sent an email to the UC account stating: "I think we are going to start big business together. There is no problem, and the cash is ready and we are waiting to you final confirmation. So please send me final PI, and the time you can deliver these items to Dubai. I need originality documentation too. My customer needs it. Please send it via email to me ASAP."

52.    On June 27, 2006, an email was sent from the ICE UC account to GHAREKHANI confirming that the items would be brought to him in the United Kingdom when he had the cash ready.

53.    On or about June 28, 2006, a fax was received at the UC account from

GHAREKHANI stating the following:

I am so please [sic] to inform you the cash is ready and we can start our business. About the PIs, we want the PI 1478/1 for $51,155.00 and wanna ask you to scan the original documentation and manuals and send them to me by Email to show our customer. I confirm everything with Mr. Tajik in couple of days, after that Mr. Tajik will inform you to get airline ticket.

Thanks a lot,
E. Gharekhani

  54. On July 3, 2006, UCA-2 sent, via facsimile, an invoice to TAJIK for

delivery and GHAREKHANI for billing for the following items:

-   1 EO Tech 550 AA HWS 552.A65/1 Holographic Weapons Sight (price $515);
-   1 ITT F7000P Gen 3 Night Vision Sight, p/n 272599-1 (price $6,990);
-   1 ITT F7001 P Gen 3 Night Vision Weapon Sight, p/n 273570-6 (price $6,990);
-   1 ITT Binocular Night Vision Goggle Gen 3, AN/PVS–23, F5050P, p/n 270733–6 (price $5,015);
-   1 ITT Night Vision Goggle Gen 3, AN/PVS–7, F5001P, p/n 270154–3 (price $3,975);
-   3 ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J (price $5,400 per unit for a total price of $16,200);
-   1 ITT Night Vision Goggle Gen 3, F5016 6 0X p/n 275722–1 (price $5,120);
-   1 ITT Gen 3 Monocular Night vision Device, AN/PVS–14 (F6015 Series), p/n 274769–2 (price $3,350); and
-   1 ITT MX–10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image Intensifier Tube (price $3,000).

This invoice listed a total price of $51,155 for these items.  All of the items (except the

Holographic Weapons Sight – the first item on the list) are defense articles listed on the

U.S. Munitions List.  Along with this invoice, UCA-2 sent GHAREKHANI, via email,

scanned images of the covers of the product manuals for a number of the defense articles

he intended to purchase.

55.     On July 5, 2006, UCA-2 sent an email to GHAREKHANI discussing the invoice and scanned images (described in paragraph 54, above). UCA-2 again confirmed with GHAREKHANI that he would deliver the items sought by GHAREKHANI to TAJIK in the United Kingdom.

56.     According to DDTC records, the below listed commodities that GHAREKHANI and TAJIK are attempting to acquire are classified as defense articles and subject to the ITAR. More specifically, the following items are categorized as significant military equipment on the U.S. Munitions List, category XII(c), and as such, require authorization in the form of a license issued by DDTC for their lawful export from the United States.

- ITT Gen 3 Monocular Night Vision Device, AN/PVS-14 (F6015 Series), p/n 274769-2
- ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J
- ITT F7000P Gen 3 Night Vision Sight, p/n 272599-1
- ITT F7001P Gen 3 Night Vision Weapon Sight, p/n 273570-6
- ITT Binocular Night Vision Goggle Gen 3, AN/PVS-23, F5050P, p/n 270733-6
- ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P, p/n 270154-3
- ITT Night Vision Goggle Gen 3, F5016 6.0X, p/n 275772-1
- ITT MX-10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image Intensifier Tube

57.     On or about July 12, 2006, GHAREKHANI sent an email to the ICE UC account confirming that he was readying payment for the proposed shipment and that "his costumer [sic] is so glad to have business with us."

58.     On July 12, 2006, UCA-2 replied to GHAREKHANI and told him that

UCA-2 would tell his supplier that the sale with TAJIK would be completed once

GHAREKHANI confirmed that the payment was ready. UCA-2 also held out the

possibility of completing additional orders with GHAREKHANI.

59.     On August 1, 2006, UCA-1 telephoned TAJIK at his office in Durham,

United Kingdom to arrange for a meeting between UCA-1, UCA-3, and TAJIK. UCA-1

explained that UCA-1 and UCA-3 were going to be in London on August 17, 2006 and

asked if TAJIK wanted to meet. TAJIK agreed to meet with UCA-1 and UCA-3 on

August 17, 2006 in London and related that he was ready to take possession of the night

vision equipment. TAJIK further related that he was just waiting for GHAREKHANI to

send him the money. In addition, TAJIK expressed that UCA-1 should "push"

GHAREKHANI to have the money sent to TAJIK prior to August 17, 2006 so the sale

could be completed. TAJIK also said that he would attempt to contact GHAREKHANI to

request that the money be sent before August 17, 2006.

60.     On or about August 3, 2006, TAJIK sent an email to the ICE UC account

relating that GHAREKHANI "will send money to my account in next few days, so please

be ready to bring instruments, [sic] to my office in Duhram and take your money here."

61.     On or about August 4, 2006, TAJIK sent an email to the ICE UC account.

In that email, TAJIK wrote "To get items [sic] from you and pay money, you should come

to my office in Durham in the North East [sic] of UK, because I can manage here with my

bank manager to get your money as cash or bank draft." TAJIK further related the

following: "[Please] organize [sic] with Mr. Gharekhani all documents which you should prepare and give those to me... but just in case please have some white paper of your company, stamp and also a [diskette] of your word file of all printed materials."

62.    On or about August 8, 2006, TAJIK sent an email to the ICE UC account explaining that a "[w]hite paper is to issue any letter which I need to re-export and for custom purpose."

63.    On or about August 8, 2006, GHAREKHANI sent an email to the ICE UC account relating that "we are waiting to your package in the 17th in UK and in 30th in Iran."

64.    On August 8, 2006, UCA-1 and UCA-3 had a telephone conference call with TAJIK at his office in Durham. During the conversation, it was explained to TAJIK that their meeting on August 17, 2006 was just to discuss business and not to complete the sale. TAJIK asked if GHAREKHANI's order could be sent to him by the end of August 2006 and said that he  "manage for the shipment...for the end of the August."

65.    On or about August 9, 2006, GHAREKHANI emailed the ICE UC account. In that email, GHAREKHANI wrote "Attached is copy of remittance form...So please bring this item to Mr. Tajik on 17th." Attached to this email was what appeared to be a copy of a bank wire transfer request for the remittance of $51,150.00 from the Saman Bank to HSBC Bank. The beneficiary was indicated as "Nosrat Tajik" in "England." According to the Central Bank of the Islamic Republic of Iran Internet website,

23

www.cbi.ir, Saman Bank Corp is located in Tehran, Iran.

66.     On August 17, 2006, UCA-1 and UCA-3 met with TAJIK in London, United Kingdom in an undercover meeting which was audio and video recorded. During the meeting, TAJIK indicated that he wanted the night vision equipment to be delivered to him in Durham, United Kingdom. TAJIK related that he would give a bank draft to the UCAs as payment for the night vision equipment. TAJIK further related that he had arranged for the night vision to be exported from the United Kingdom by the end of August 2006.

67.     During the August 17, 2006 meeting, TAJIK instructed the UCAs to provide two invoices for the night vision equipment. One invoice with a true and accurate description of the products and their value and one false invoice mis-describing and undervaluing the equipment. Specifically, TAJIK said "I need two invoices...On another one [invoice], just put 'used.' I can e-mail you because I don't know. Let me organize it, Mr. Gharekhani, say next week...I organize with him [GHAREKHANI] and ask him what items we should put that, easy for him to clear the, or release the Customs. So, just beneath the amount, ten percent. Five thousand [5000] is good...I will ask you not to put the whole, only two or three lines...Do you know, it doesn't need for all the equipment, or names of the equipment. Two or three names. Say even, 'used binoculars' or 'sample binoculars'...Then, send it to Iran your invoice."

68.     Also during the August 17, 2006 meeting, TAJIK inquired about a 35mm

24

naval gun system made by the Swiss company, Oerlikon, which was installed on navy ships in the Middle East. Further research revealed that Oerlikon Contraves is a manufacturer of military and defense systems located in Switzerland and does in fact manufacture a 35mm naval gun system called the Millennium. According to Oerlikon Contraves, the Millennium is a 35 mm revolver gun with a firing rate of 1,000 rounds per minute, suitable for missions against aerial, naval, and land-based targets. The Millennium uses air-bursting munitions making it the only gun capable to defeat guided missiles at ranges exceeding 1.2 kilometers. Further research indicated that U.S. Department of Defense contractor Lockheed Martin is an Oerlikon Contraves licensee for the sale and manufacture of this weapon system.

69.    At one point during the August 17, 2006, meeting, the UCAs showed TAJIK the following: (1) an ITT F7000P Gen 3 Night Vision Sight, p/n 272599-1; (2) an ITT Gen 3 Monocular Night Vision Device, AN/PVS-14 (F6015 Series), p/n 274769-2; and (3)an ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J. All of these items are defense articles categorized as significant military equipment on the U.S. Munitions List and subject to the ITAR. Upon being shown these items, TAJIK examined the items and demonstrated his working familiarity with them. The UCAs again told TAJIK that there was currently an embargo against exporting these items to Iran and that it was illegal for the UCAs to even have these items in Britain. Sometime thereafter, TAJIK, in an effort to thwart electronic surveillance TAJIK first asked for a radio to play during his

conversations with the UCAs, and, upon being told that the UCAs did not have a radio, began speaking very softly while tapping on the table with his hands. TAJIK ultimately agreed to purchase the night vision described in paragraph 54, above, and told the UCAs that he would arrange payment through GHAREKHANI (via wire from GHAREKHANI in Iran to TAJIK's bank account in Britain). TAJIK also explained he wanted conduct additional business with the UCAs.

70.    On or about August 23, 2006, GHAREKHANI sent an email to the ICE UC account explaining that he estimates more than one million dollars in orders over the next six months from his customer but that "every thing is depend on these samples." GHAREKHANI also inquired about obtaining "gyro and other things" from Raytheon for subsequent sale in Iran. Note Raytheon is a U.S. Department of Defense contractor and major defense and government industry supplier headquartered in Waltham, Massachusetts.

71.    On or about August 30, 2006, TAJIK sent an email to the ICE UC account stating as follows: "Money is ready. Would you please tell me when you will be ready to come to Durham, [England]?" A courtesy copy of this e-mail was also sent to GHAREKHANI.

72.    A query of records on file with DDTC, revealed that there have been no license applications to, nor licenses issued by, DDTC, with respect to the export or re-export of any goods, technology, or services to include brokering activities, by or on

26

behalf of, GHAREKHANI, TAJIK, or any of their associated business entities.

73.    Based on all of the forgoing, I believe there is probable cause to believe that

Nosratollah TAJIK and Esmaiil GHAREKHANI, and others, have: (1) conspired to

knowingly and willfully export night vision equipment, defense articles, from the United

States to the United Kingdom, without first obtaining the required license or written

approval from the Directorate of Defense Trade Controls, in violation of the Arms Export

Control Act codified at 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3); (2) knowingly and

willfully attempted to export from the United States and re-export and re-transfer from

one foreign destination to another foreign destination, namely from the United Kingdom

to Iran, night vision equipment, U.S. origin defense articles, without first obtaining the

required license or written approval from the Directorate of Defense Trade Controls, in

violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1); and (3) aided and abetted

these offenses in violation of 22 U.S.C. § 2778, 22 C.F.R. § 127.1(d) and 18 U.S.C. § 2.

FURTHER AFFIANT SAYETH NOT.

Mark Knoblock, Special Agent
U.S. Immigration and Customs Enforcement,
U.S. Department of Homeland Security

SUBSCRIBED and SWORN before me
this 30TH day of August 2006.

HONORABLE MICHAEL T. MASON
United States Magistrate Judge

27