UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

AUG 3 0 2006
August 30, 2006
MICHAEL T. MASON
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 06 CR 515 |
| v. | ) | |
| | ) | Michael T. Mason |
| NOSRATOLLAH TAJIK, aka | ) | United States Magistrate Judge |
| "Nasret Allah Tajek" | ) | |
| | ) | **UNDER SEAL** |
| | ) | |
| | ) | |

**AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION OF
NOSRATOLLAH TAJIK**

I, Daniel Rubinstein, being duly sworn, state that:

1.    I am a citizen of the United States of America and a
resident of the state of Illinois.

2.    I graduated from Boston University School of Law in
1995.  From January 2004, to the present, I have been employed by
the United States Department of Justice as an Assistant United
States Attorney for the Northern District of Illinois.  My duties
are to prosecute persons charged with criminal violations of the
laws of the United States.  During my practice as an Assistant
United States Attorney, I have become knowledgeable about the
criminal laws and procedures of the United States.

3.    As an Assistant U.S. Attorney for the Northern District
of Illinois, I am responsible for the preparation and prosecution
of criminal cases.  Based upon my training and experience, I am
an expert in the criminal laws and procedures of the United
States.

1

4.    In the course of my duties, I have become familiar with the charges and evidence in the case of <u>United States v. Nosratollah Tajik</u>, 06 CR 615. This prosecution arose from an investigation by the United States Immigration and Customs Enforcement ("ICE"), part of the United States Department of Homeland Security, which revealed that beginning on a date unknown to August 2006, Nosratollah Tajik ("TAJIK"), a citizen of Iran, conspired with Esmaiil Gharekhani ("GHAREKHANI") to export defense articles, namely night vision equipment, from the United States to the United Kingdom, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of the Arms Export Control Act codified at 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3); and (2) knowingly and willfully attempted to export from the United States and re-export and re-transfer from one foreign destination to another foreign destination, namely from the United Kingdom to Iran, night vision equipment, U.S. origin defense articles, without first obtaining the required license or written approval from the Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1); and (3) aided and abetted these offenses in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(d) and 18 U.S.C. § 2.

## SUMMARY OF THE FACTS OF THE CASE

5.   On October 21, 2005, it came to the attention of law enforcement authorities that the following email (verbatim below) was sent to a U.S. e-mail address from gharekhani@iag-co.com: one of my customers want to order following:

```
1- termal binocoular
2-night vision gogels
3-night vision tools
4-laser range finder
5- laser aming gun

i think we may have 3,000,000 USD order, so i wanna to be
your exclusive agent in iran, please repply to me as soon as
possible.

best regards.
ghrekhani
tel:+98 21 22592267
fax:+98 21 22592251
cell:+98 912 324 5476
www.iag-co.com
```

6.   The email was sent from Internet protocol ("IP") address 80.253.135.198 that was assigned to the Internet service provider ISP AZADONLINE NETWORKS located in Tehran, Iran.  Also, www.iag-co.com was registered to Amir Pournasserian of Tehran, Iran and was an Internet site for the Industrial Automation Group located at Apt. 13, 3rd Floor, No. 337 Dolat Str., Pasdaran Ave., P.O. Box 19446, Tehran, Iran.

7.   On October 24, 2005, a reply was sent to gharekhani@iag-co.com stating that "the export of products to Iran from the United States is currently restricted" but "that you may contact a local representative that may be able to

3

assist..."

8.   On October 28, 2005, an ICE undercover agent ("UCA-1")
placed a call to 98-9123245476, the number listed in the October
21, 2005 email. A male who identified himself as GHAREKHANI
answered the call. UCA-1 asked GHAREKHANI if his client was in
Iran, to which GHAREKHANI answered "yes." UCA-1 told GHAREKHANI
that due to the current U.S. sanctions against Iran, it was
difficult to export to Iran. GHAREKHANI told UCA-1 that it was
not a problem and that goods could be sent to his office in
Turkey where he could receive them.  GHAREKHANI also told UCA-1
that his client wanted to purchase at least $3 million worth of
night vision equipment and other products.

9.   On October 29, 2005, GHAREKHANI sent another email to
the ICE UC account requesting printed catalogs for a sales
presentation to his customer in Iran. The email requested that
the catalogs be sent to his attention at "no 13 no 337 dolat str,
pasdaran, tehran, iran." The email also specified that GHAREKHANI
had an office in Istanbul where he could receive products from
the United States.

10.  On November 4, 2005, an ICE undercover agent ("UCA-2")
sent an email to GHAREKHANI from the ICE UC account and advised
him that the product catalogs were ready to be sent, but asked
GHAREKHANI if the catalogs should be sent to Turkey "since it is
not legal to export to Iran."

4

11.  On November 11, 2005, GHAREKHANI sent an email to the ICE UC email account stating that he "had a [good] meeting with [his] customer" and that "they" were interested in [the] products; and that they wanted to purchase night vision goggles, night vision binoculars, and laser range finders. In this email, GHAREKHANI asked if UCA-1 was sure that these products could be sold to him in Iran or to his office in Turkey." GHAREKHANI further requested "an agreement for start ur [sic] cooperation, I need an agreement fot [sic] start my presentation in Iran."

12.  On November 14, 2005, UCA-2 sent an email to GHAREKHANI from the ICE UC account explaining that it was not legal to sell anything in Iran without a government license.  He also stated that we "could not get a license to sell night vision items to Iran." The email continued by noting that "even if we sell to your Turkey office but they go to Iran, it is still not legal and we can go to jail."

13.  On December 16, 2005, GHAREKHANI sent the following in an email to the ICE UC account: " . . . in this step I think we need to prepare an agreement between us[.] I think we can have wide cooperation . . ."

14.  Between December 16, 2005, and January 20, 2006, GHAREKHANI communicated with the ICE UC account on four more occasions regarding the purchase of night vision equipment.

15.  On January 20, 2006, GHAREKHANI sent the following in

an email to the ICE UC account:

> I start my negation with my costumer [sic], they need some
> sample and I will order these samples to you ASAP. But
> before that I need an agreement between me and you, and we
> need to review the process, where you can send these
> products, method of the payment and etc. I am waiting to
> your suggestion.

16.   On January 23, 2006, GHAREKHANI sent another email to

the ICE UC account explaining that "we start our business from

now, we have start our order, for this step I want to order this

part[.]" The following quantity and items were listed:

| QUANTITY | ITEM |
|----------|------|
| 3 | EO Tech AA 552.A65/1 [Holographic Weapon Sights] |
| 3 | ITT F7000 [Generation 3 Night Vision Weapon Sights] |
| 3 | ITT F7001 [Generation 3 Night Vision Weapon Sights] |
| 3 | ITT AN/PVS14 [Generation 3 Night Vision Monocular] |
| 3 | ITT 268549 [Purge Kit for Night Vision Goggles] |

17.   On January 26, 2006, UCA-2, as requested, e-mailed a

price quotation for the above listed items to GHAREKHANI from the

ICE UC account quoting a price of $55,170.00.

18.   On January 26, 2006, GHAREKHANI and UCA-2 communicated

via a Yahoo! Instant Messenger chat. During that exchange,

GHAREKHANI related to UCA-2 that he had received the

above-mentioned quote via email and that he would send it to his

costumer from whom he had a big order. GHAREKHANI inquired if the

UCA-2 was sure that they could conduct this business.  UCA-2

replied that they could if they were careful.

19.   On February 2, 2006, GHAREKHANI sent the following in

an email to the ICE UC account:

> As you told, we must be careful, it is very big risk, so I
> want you to help me to find a best way, as you know Iran
> have not good position in world now, and in other hand this
> order is very big order. Tell me more about your friend;[1] I
> think in this step and in this business the price is not
> important, and if you sure about him, we can do this with
> him, but tell me more about it's price, for example if they
> want to ship this samples how much they will give for
> samples? And in final order how much they want to ship each
> package (including 50,000 USD or more)?

20.  On February 5, 2006, GHAREKHANI sent an email to the
ICE UC account stating that, "I found ways for that, please reply
to me, I want to order some products, we had started it." UCA-2
replied with a request that GHAREKHANI tell him the way.

21.  On February 6, 2006, GHAREKHANI sent the following in
an email to the UC account:

So sorry, I received your E-mail late, see you can send me
packages in this ways:

> 1- You can send them to one of my partners' offices in
> Sweden.
> 2- You can send them to one of my partners' offices in
> Germany.
> 3- You can send them to one of my partners' offices in
> Istanbul (Turkey); it is better for me and my partners, if
> you sent it to turkey we can ship it easily.
> I can suggest that 3 offices; what is your suggestion? Do
> you can send them to one of these countries? We can start
> and check this ways with small parties. We can test all of
> this ways and use all of them in final order.

22.  On February 7, 2006, via instant messaging, GHAREKHANI

---

[1] Prior to this point in the negotiation, ICE had discussed with
GHAREKHANI introducing another person (who was undercover
operative) into the transaction in order assist with shipping, if
necessary.

in which he identified his partner in Turkey (referred to in this affidavit as "Individual A"). On February 7, 2006, GHAREKHANI also conveyed via instant messaging that Individual A told him (GHAREKHANI) to send the three EO Tech holographic weapon sights to Turkey but to "write on the package its [sic] a gift with no value... e.g. worth is zero usd... no commercial good... so we have here no problem."

23.  On February 10, 2006, GHAREKHANI sent a purchase order for three EO Tech 550 AA HWS 552.A65/1 holographic weapon sights via email to the UC account, and provided a shipping address in Turkey.  GHAREKHANI's email specified that this was his partner's address in Istanbul. The email continued "Please send me PI [pro forma invoice] to this address. I want to do EOTECH products with this address. He will have contact with you in this product. I will tell you more about him. I am waiting hearing from you ASAP."

24.  On March 12, 2006, GHAREKHANI sent the following in an email to the UC account:

> Our customer wants to buy ITT products and don't have any
> problem with your prices. Just one point which is our
> partner told us turkish goverment doesn't let these goods
> for importing and exporting, so we have to work with dubai;
> but as you know chicago-dubai is an known way for shipping
> so I suggest you to send a 2-pieces package to clearify the
> way after that ship more pieces. If you agree with me for
> shpping the package to dubai directly please notify me to
> send you the address in dubai.

25.  On March 15, 2006, GHAREKHANI provided, via an email

8

sent to the UC account, the address for his "partner" in Dubai,
United Arab Emirates.

26.  On April 12, 2006, GHAREKHANI sent, via email to the UC
account, a purchase order dated April 12, 2006, for the following
items and requested a pro forma invoice for these items including
shipping costs to Dubai, U.A.E.:

- One ITT F6015PA NV Monocular, part number 274769-2
- Two ITT Modular Day/Night Generation 3 Weapon Sights, part
  number F7201J
- Two HYTECH Night Diver Underwater Night Vision Goggles
- Two ITT F7001P Generation 3 Night Vision Weapon Sights,
  part number 273570-6

27.  On May 2, 2006, GHAREKHANI sent a purchase order dated
May 2, 2006, via facsimile to the UC undercover account for the
following items for shipment to Dubai, U.A.E.

- One EO Tech 552.A65/1 [Holographic Weapon Sight]
- One ITT NV F5050 [Generation 3 Binocular Night Vision
  Goggle]
- One ITT NV F5001 [Generation 3 Night Vision Goggle,
  AN/PVS-7]
- One ITT NV F7201 [Generation 3 Modular Day/Night Weapon
  sight]
- One ITT NV F5016 [Generation 3 Night Vision Goggle]
- One Leica Victor 5 [camera]
- One ITT 18 MM NV Tube MX-10130 [Generation 3 Image
  Intensifier Tube]

28.  In April and May 2006, respectively, UCA-2 sent via
email from the UC account, pro forma invoices pursuant to
GHAREKHANI's two purchase orders. The pro forma invoices
indicated that the following commodities would be sold to
GHAREKHANI for a total of $64,985.00 upon meeting the terms of
the sale:

- One EO Tech 550 AA HWS 552.A65/1 Holographic Weapon Sight
- One ITT Gen 3 Monocular Night Vision Device, AN/PVS-14
  (F6015 Series), p/n 274769-2
- Three ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J
- Two ITT F7001P Gen 3 Night Vision Weapon Sight, p/n
  273570-6
- One ITT Binocular Night Vision Goggle Gen 3, AN/PVS-23,
  F5050P p/n 270733-6
- One ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P p/n
  270154-3
- One ITT Night Vision Goggle Gen 3, F5016 6.0X p/n 275772-1
- One ITT Generation 3 Auto Gating Night Vision Image
  Intensifier tube
- Two HYTECH Night Diver Underwater Gen 2+ Night Vision
  Goggles[2]

29.  The terms of the pro forma invoices included the

following:

PAYMENT TERMS: 80% cash in advance and 20% at or before delivery
to the buyer's agent in the United States.

EXPORT RESTRICTIONS: The export of night vision, thermal imaging,
and optical equipment is prohibited without a valid export
license issued by the U.S. Department of State in accordance with
the International Traffic in Arms Regulations. The sale,
transfer, or shipment of any goods or technology from the U.S. is
also subject to the authority of the U.S. Department of Commerce
in accordance with the Export Administration Regulations. The
sale, transfer, or shipment of goods or services from the U.S. to
embargoed destinations such as Cuba, Iran, Sudan, and Syria is
prohibited and is a federal crime. It is the buyer's
responsibility to obtain all licenses for the use and or export
of subject items and to ensure that the requirements of all U.S.
and international laws and regulations are met.

30.  On May 6, 2006, GHAREKHANI sent the following in an

email to the UC account: "Mr. Tajik is my partner in the UK who

will be in contact with you from this time and you can ship the

---

[2] All of these items, with the exception of the first (the
"Holographic Weapon Sight") are defense articles on the U.S.
Munitions list and controlled by AECA.

orders to his company in the UK. I think it is better for you to do this business with a British company. He will call you ASAP and you can finalize every thing with him."

31. Mr. Tajik has been identified as Nosratollah Tajik ("TAJIK"). TAJIK is a director of the private limited company UK Islamic Direct Business Limited located in Harrow, Middlesex. He is also an academic researcher and resides in the United Kingdom. From December 1999 through October 2003, he was the Iranian ambassador to Jordan.

32. On May 8, 2006 a telephone voice mail message was received on an ICE UC telephone line from an individual identifying himself as "TAJIK." TAJIK said that he was calling on behalf of GHAREKHANI. He said that he was supposed to be in the U.K. but that he was currently in Iran and could be reached at 98-9126725797.

33. On May 8, 2006, GHAREKHANI sent a request via fax for a quote for a Helmet Mounted Infrared Thermal Imager. GHAREKAHI also said that TAJIK would make the payments with a British company and that TAJIK would call and the items could be shipped to his company in the United Kingdom.

34. On May 9, 2006, an email was sent to GHAREKHANI from the UC account asking GHAREKHANI how he knew TAJIK and if he had worked with him before. GHAREKHANI replied that he had known TAJIK for a long time and that he was one of his best friends and

11

partners. He said that TAJIK was in Iran and asked UCA-1 to

contact him.  In a subsequent email, GHAREKHANI provided TAJIK's

email address as acico@acico.co.uk.

35.  On May 11, 2006, UCA-1 telephoned GHAREKHANI at

98-2122618921.  During this conversation, GHAREKHANI reiterated

that TAJIK was one of his best friends who he known for a long

time and that he told TAJIK everything about his business.

36.  On May 11, 2006, TAJIK telephoned UCA-1. During that

conversation, TAJIK explained that GHAREKHANI had informed him

about the business deal involving night vision equipment and that

GHAREKHANI asked him [TAJIK] to continue with the transaction and

shipping.

37.  On May 16, 2006, UCA-1 telephoned TAJIK in Iran at

number 98-9126725797.  During that conversation TAJIK said that

he knew that the goods being sold to GHAREKHANI consisted of ITT

night vision military equipment.  UCA-1 then informed TAJIK that

it was illegal to ship the items from the United States without a

license and that UCA-1 was unable to get a license. TAJIK

responded that he could ship the items from the United Kingdom to

Iran or that UCA-1 could send the items to Iran via Dubai, U.A.E.

TAJIK explained that he had a colleague in Dubai through whom he

could send the items to Iran from Dubai. TAJIK said that he

preferred to deal through the U.K.  UCA-1 asked TAJIK if he had

received any U.S. products in the U.K. that he had shipped to

Iran.  TAJIK said that he had shipped night vision and other
equipment that he received from the United States to Iran last
month and did not encounter any problems.  He told UCA-1 that the
United States company from whom he acquired the items did not
know that he was going to ship them to Iran.  He explained that
when the items are shipped to the United Kingdom that he changes
the shipping labels for shipment to Iran.  TAJIK asked UCA-1 if
he/she was a representative of the company ITT and UCA-1 related
that he/she was not but that he/she had an inside connection at
the company and that he/she had to pay the person on the side to
acquire the items. TAJIK said that he and GHAREKHANI agreed to
open a letter of credit for payment to UCA-1 upon shipment of the
items to the United Kingdom.

    38.  On May 16, 2006, TAJIK sent an email to the UC account
requesting a beneficiary name, account number, SORT code, and
address for the letter of credit. The email was sent from the
email address acicouk@yahoo.co.uk and listed TAJIK's contact
information as follows:

    Head Office:
    12 Elahiyeh 3, Modarres Express way, Tehran Iran- Post Code:
    19159
    T: +98(0)21 22612048 / F: 22005163 / E: info@acico.co.uk
    UK branch:
    58 Beechfield Rise-Coxcoe- Durham DH6 4SB
    Tel/fax: 01913778390 & Mobile: 07986515758 / E:
    acico@acico.co.uk

    39.  On May 25, 2006, UCA-2 sent an email from the UC
account to TAJIK reiterating that it is not legal to send the

military items without a license and that it is a very big risk for a letter of credit.  In a reply email dated May 26, 2006, TAJIK said that he was not authorized to give any money in advance to UCA-2 and that if a letter of credit was not opened for the transaction, UCA-2 could bring the instruments to London and receive the payment. He  added that they wanted to buy these instruments, but that they have other options in Europe.

40.  On June 5, 2006, TAJIK sent an email to the UC account stating the he had returned to the United Kingdom from Iran and that he was ready to pay for and receive the first order.  TAJIK said that the place of delivery could be either in London or Newcastle.

41.  On June 5, 2006, TAJIK emailed the pro forma invoice dated May 3, 2006, that had previously emailed to GHAREKHANI from the UC account. In this email, TAJIK asked UCA-1 if he could prepare this order by Thursday because there was a shipment facility for Friday to Iran.  In a reply email sent from the UC account, TAJIK was asked if he had an agent in the United States who could receive the order. He replied that he did not have an agent in the United States so UCA-1 should deliver the instruments himself to TAJIK in the United Kingdom.

42.  On June 7, 2006, GHAREKHAN1 sent an email to the ICE UC account saying that they were ready to start our business.  He said that he would send cash to Mr. TAJIK, everything should be

14

finalized TAJIK.

43.   On June 7, 2006, another ICE undercover Agent ("UCA-3") telephoned TAJIK in the United Kingdom at 44-1913778390. During the conversation TAJIK said that one of his relatives who was in the United Kingdom was going to travel to Iran on Saturday, June 10, 2006. TAJIK sid that he could send the night vision equipment to Iran with his relative.  TAJIK also told UCA-3 that he would meet him in London. TAJIK also explained that he planned to bring the money from Iran.  TAJIK ended by saying that when he meets UCA-1 they can explore other business.

44.   In a follow-up email to UCA-3 dated June 7, 2006, TAJIK instructed UCA-3 to bring all equipment to London and where TAJIK would pay UCA-3 in cash or bank draft.

45.   On June 26, 2006, GHAREKHANI sent an email to the UC account stating: "I think we are going to start big business together. There is no problem, and the cash is ready and we are waiting to you final confirmation. So please send me final PI, and the time you can deliver these items to Dubai. I need originality documentation too. My customer needs it. Please send it via email to me ASAP."

46.   On June 27, 2006, an email was sent from the UC account to GHAREKHANI confirming that the items would be brought to him in the United Kingdom when he had the cash ready.

47.   On June 28, 2006, a fax was received at the UC account

from GHAREKHANI stating that the cash was ready.  It further

stated:

> About the PIs, we want the PI 1478/1 for $51,155.00 and
> wanna ask you to scan the original documentation and manuals
> and send them to me by Email to show our customer.  I
> confirm everything with Mr. Tajik in couple of days, after
> that Mr. Tajik will inform you to get airline ticket.

48.  On July 3, 2006, UCA-2 sent, via facsimile, an invoice

to TAJIK for delivery and to GHAREKHANI for billing for the

following items:

- 1 EO Tech 550 AA HWS 552.A65/1 Holographic Weapons
  Sight (price $515);
- 1 ITT F7000P Gen 3 Night Vision Sight, p/n 272599-1
  (price $6,990);
- 1 ITT F7001 P Gen 3 Night Vision Weapon Sight, p/n
  273570-6 (price $6,990);
- 1 ITT Binocular Night Vision Goggle Gen 3, AN/PVS-23,
  F5050P, p/n 270733-6 (price $5,015);
- 1 ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P, p/n
  270154-3 (price $3,975);
- 3 ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J
  (price $5,400 per unit for a total price of $16,200);
- 1 ITT Night Vision Goggle Gen 3, F5016 6 0X p/n
  275722-1 (price $5,120);
- 1 ITT Gen 3 Monocular Night vision Device, AN/PVS-14
  (F6015 Series), p/n 274769-2 (price $3,350); and
- 1 ITT MX-10130 Pinnacle Gen 3 18 mm Auto Gating Night
  Vision Image Intensifier Tube (price $3,000).

49.  This invoice listed a total price of $51,155 for these

items.  All of the items (except the Holographic Weapons Sight -

the first item on the list) are defense articles listed on the

U.S. Munitions List.  Along with this invoice, UCA-2 sent

GHAREKHANI, via e-mail, scanned images of the covers of the

product manuals for a number of the defense articles he intended

to purchase.

50.   On July 5, 2006, the UCA-2 sent an e-mail to GHAREKHANI discussing the invoice and scanned images.  UCA-2 again confirmed with GHAREKHANI that he would deliver the items sought by GHAREKHANI to TAJIK in the United Kingdom.

51.   The commodities that GHAREKHANI and TAJIK attempted to acquire are classified as defense articles. More specifically, the following items are categorized as significant military equipment on the U.S. Munitions List, category XII(c), and as such, require authorization in the form of a license issued by DDTC for their lawful export from the United States.

- ITT Gen 3 Monocular Night Vision Device, AN/PVS-14 (F6015 Series), p/n 274769-2
- ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J
- ITT F7000P Gen 3 Night Vision Sight, p/n 272599-1
- ITT F7001P Gen 3 Night Vision Weapon Sight, p/n 273570-6
- ITT Binocular Night Vision Goggle Gen 3, AN/PVS-23, F5050P, p/n 270733-6
- ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P, p/n 270154-3
- ITT Night Vision Goggle Gen 3, F5016 6.0X, p/n 275772-1
- ITT MX-10130 Pinnacle Gen 3 18 mm Auto Gating Night Vision Image Intensifier Tube

52.   On July 12, 2006, GHAREKHANI sent an email to the ICE UC account confirming that he was readying payment for the proposed shipment.

53.   On July 12, 2006, UCA-2 replied to GHAREKHANI and told him that UCA-2 would tell his supplier that the sale with TAJIK would be completed once GHAREKHANI confirmed that the payment was ready.  UCA-2 also held out the possibility of completing additional orders with GHAREKHANI.

54.  On August 1, 2006, UCA-1 telephoned TAJIK at his office in Durham to arrange a meeting between UCA-1, UCA-3, and TAJIK. UCA-1 explained that he/she and UCA-3 were going to be in London on August 17, 2006, and asked if TAJIK wanted to meet with them. TAJIK agreed to meet in London on August 17, 2006 and said that he was ready to take possession of the night vision equipment, and he was just waiting for GHAREKHANI to send him the money.

55.  On August 3, 2006, TAJIK sent an email to the ICE UC account relaying that GHAREKHANI would send money to TAJIK's account in the next few days, so please be ready to bring instruments to my office in Duhram and receive your money.

56.  On August 4, 2006, TAJIK sent an email to the ICE UC account. In that email, TAJIK told UCA-1 that he should bring the items to TAJIK's office in Durham because he could arrange with his bank manager to get the payment in cash or a bank draft. TAJIK further instructed UCA-1 to prepare all the documents with Mr. Gharekhani and bring them to TAJIK.  He further instructed UCA-1 to bring some "white paper of your company," stationery, stamps and a diskette of your word file of all the printed materials.

57.  On or about August 8, 2006, TAJIK sent an email to the ICE UC account explaining that a the stationery was to be used to issue any letter that he might need to re-export and for custom purposes.

58.   On August 8, 2006, GHAREKHANI sent an email to the ICE UC account relating that "we are waiting to your package in the 17th in UK and in 30th in Iran."

59.   On August 8, 2006, UCA-1 and UCA-3 had a telephone conference call with TAJIK who was at his office in Durham. During the conversation, they explained to TAJIK that their meeting on August 17, 2006, was just to discuss business and not to complete the sale. TAJIK asked if GHAREKHANI's order could be sent to him by the end of August 2006 and said that he would manage for its shipment for the end of .

60.   On August 9, 2006, GHAREKHANI emailed the ICE UC account a copy of the wire remittance form which requested the transfer of $51,150.00 from the Saman Bank (in Iran) to HSBC Bank (in England). The beneficiary was indicated as Nosrat Tajik in England.

61.   On August 17, 2006, UCA-1 and UCA-3 met with TAJIK in London in an undercover meeting during which TAJIK said that he wanted the night vision equipment to be delivered to him in Durham and that he had arranged for it to be exported from the United Kingdom by the end of August 2006.  He said that he would pay for the equipment with a bank draft.

62.   During the August 17, 2006 meeting, TAJIK gave detailed instructions to the UCAs to provide two invoices for the night vision equipment -- one invoice reflecting a true and accurate

19

description of the products and their value, and one invoice reflecting a false description and value for the equipment.

63.  Also during the August 17, 2006 meeting, TAJIK inquired about a 35mm naval gun system made by the Swiss company, Oerlikon, which was installed on navy ships in the Middle East. Oerlikon Contraves is a manufacturer of military and defense systems located in Switzerland that manufactures a 35mm naval gun system called the Millennium, a 35 mm revolver gun with a firing rate of 1,000 rounds per minute.  The weapon is suitable for missions against aerial, naval, and land-based targets.  It uses air-bursting munitions making it the only gun capable of defeating guided missiles at ranges exceeding 1.2 kilometers.

64.  At one point during the August 17, 2006, meeting, the UCAs showed TAJIK the following: (1) an ITT F7000P Gen 3 Night Vision Sight, p/n 272599-1; (2) an ITT Gen 3 Monocular Night Vision Device, AN/PVS-14 (F6015 Series), p/n 274769-2; and (3) an ITT Gen 3 Modular Day/Night Weapon sight, p/n F7201J.  All of these items are defense articles categorized as significant military equipment on the U.S. Munitions List and subject to ITAR.  TAJIK examined the items and demonstrated his working familiarity with them.  The UCAs reminded TAJIK that there was an embargo against exporting these items to Iran and that it was illegal for the UCAs to even have these items in Britain. Sometime thereafter, TAJIK, in an apparent effort to thwart

electronic surveillance, asked that a radio play during his conversations with the UCAs. When the UCAs told him that they did not have a radio he began speaking very softly while tapping on the table with his hands. TAJIK ultimately agreed to purchase the night vision and told the UCAs that he would arrange payment through GHAREKHANI (via wire from GHAREKHANI in Iran to TAJIK's bank account in Britain). TAJIK also explained he wanted to conduct additional business with the UCAs.

65. On August 23, 2006, GHAREKHANI sent an email to the ICE UC account explaining that he estimates that he will receive more than one million dollars in orders over the next six months from his customer but that future orders depend on these samples. GHAREKHANI also inquired about obtaining military equipment from Raytheon for subsequent sale in Iran.

66. The DDTC has not received any license applications, nor have they issued any licenses with respect to the export or re-export of any goods, technology, or services to include brokering activities, by or on behalf of, GHAREKHANI, TAJIK, or any of their associated business entities.

PROCEDURAL HISTORY OF THE CASE

67. Under the laws of the United States, a criminal prosecution may be commenced by the filing of a criminal complaint in a United States District Court. A criminal complaint is a written statement of essential facts constituting

21

an offense charged and is made under oath before a United States
Magistrate Judge.  A criminal complaint must establish that
probable cause exists to believe that an offense has been
committed and that the defendant named in the complaint committed
it.  If satisfied that the complaint sets forth a sufficient
factual basis to establish probable cause, the United States
Magistrate Judge orders the issuance of a warrant for the arrest
for the defendant named in the complaint.

68.  On August 30, 2006, Special Agent Mark Knoblock of the
ICE filed a criminal complaint before United States Magistrate
Judge Mason of the Northern District of Illinois formally
charging Nosratollah Tajik with criminal offenses against the
laws of the United States.  It is the practice of the United
States District Court for the Northern District of Illinois to
retain the original complaint and file it with the records of the
court.  Therefore, I have obtained a copy of the complaint,
certified as true and accurate, from the clerk of the court, and
attached it to this affidavit as exhibit A.

69.  On August 30, 2006, United States Magistrate Judge
Michael T. Mason signed a warrant for the arrest of Nosratollah
Tajik.  It is the practice of the United States District Court
for the Northern District of Illinois to retain the original
arrest warrant and file it with the records of the court.
Therefore, I have obtained a copy of the arrest warrant,

certified as true and accurate, from the clerk of the court, and

attached it to this affidavit as exhibit B.

<u>The Charges and Pertinent United States Law</u>

    70. The Complaint charges in two counts that TAJIK and

GHAREKHANI committed the following offenses:

Count 1:    Conspired with each other and others to knowingly and
willfully export defense articles, namely night vision
equipment, including the following items:

    (1)    Two ITT F7001P Gen 3 Night Vision Weapon Sight, p/n
273570-6;
    (2)    One  ITT Binocular Night Vision Goggle Gen 3,
AN/PVS-23, F5050P, p/n 270733-6;
    (3)    One ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P,
p/n 270154-3;
    (4)    Three  ITT Gen 3 Modular Day/Night Weapon sight, p/n
F7201J;
    (5)    One  ITT Night Vision Goggle Gen 3, F5016 6 0X p/n
275722-1;
    (6)    One ITT Gen 3 Monocular Night vision Device, AN/PVS-14
(F6015 Series), p/n 274769-2; and
    (7)    One ITT MX-10130 Pinnacle Gen 3 18 mm Auto Gating Night
Vision Image Intensifier Tube,

        from the United States to Iran, without first obtaining
the required license or written approval from the
United States Department of State, Directorate of
Defense Trade Controls, in violation of 22 U.S.C. §
2778 and 22 C.F.R. § 127.1(a)(3) and (d) and 18 U.S.C.
§ 2.

Count 2:    ESMAIIL GHAREKHANI and NOSRATOLLAH TAJIK, did knowingly
and willfully attempt to export from the United States
and re-export and re-transfer from the United Kingdom
to Iran, night vision equipment including the following
items:

    (1)    Two ITT F7001 P Gen 3 Night Vision Weapon Sight, p/n
273570-6;
    (2)    One  ITT Binocular Night Vision Goggle Gen 3,
AN/PVS-23, F5050P, p/n 270733-6;
    (3)    One ITT Night Vision Goggle Gen 3, AN/PVS-7, F5001P,
p/n 270154-3;

(4)    Three  ITT Gen 3 Modular Day/Night Weapon sight, p/n
        F7201J;

(5)    One  ITT Night Vision Goggle Gen 3, F5016 6 0X p/n
        275722-1;

(6)    One ITT Gen 3 Monocular Night vision Device, AN/PVS-14
        (F6015 Series), p/n 274769-2; and

(7)    One ITT MX-10130 Pinnacle Gen 3 18 mm Auto Gating Night
        Vision Image Intensifier Tube,

        U.S. origin defense articles, without first obtaining
        the required license or written approval from the
        United States Department of State, Directorate of
        Defense Trade Controls, in violation of 22 U.S.C. §
        2778 and 22 C.F.R. § 127.1(a)(1) and (d) and 18 U.S.C.
        § 2.

71.   The United States requests the extradition of
Nosratollah Tajik for all of these offenses.  Each count charges
a separate offense.  Each offense is punishable under a statute
that (1) was the duly enacted law of the United States at the
time the offense was committed, (2) was the duly enacted law of
the United States at the time the complaint was filed, and (3) is
currently in effect.  Each offense is a felony offense punishable
under United States law by more that one year of imprisonment.  I
have attached copies of the pertinent sections of these statutes
and their penalties to this affidavit as exhibit C.

    Count 1.

72.   Count 1 charges Nosratollah Tajik with conspiracy to
commit a substantive offenses against the United States,
specifically, knowingly and willfully exporting defense articles,
namely night vision equipment, from the United States to Iran,
without first obtaining the required license or written approval

from the United States Department of State, Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(3) and (d) and 18 U.S.C. § 2.

73. To satisfy its burden of proof and convict TAJIK on Count 1, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) that two or more persons entered an agreement to commit the underlying offense of (i.e., wilfully (meaning with knowledge that the exportation was unlawful) exporting or causing to be exported a defense article,); and (2) that TAJIK knowingly became a member of the conspiracy to commit the underlying offense.

Count 2.

74. Count 2 charges TAJIK with committing a substantive offenses against the United States, specifically, knowingly and willfully attempting to export defense articles, namely night vision equipment, from the United States to Iran, without first obtaining the required license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of 22 U.S.C. § 2778 and 22 C.F.R. § 127.1(a)(1) and (d) and 18 U.S.C. § 2.

75. To satisfy its burden of proof and convict TAJIK on Count 2, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) the defendant attempted to export or cause to be exported a

defense article; (2) the defendant failed to obtain a license
from the United States Department of State before attempting to
export the defense article; and (3) the defendant acted wilfully,
that is with knowledge that the attempted exportation was
unlawful.  "Attempt" means that the defendant knowingly took a
substantial step toward the commission of the offense with the
intent to commit the offense.

76.  As outlined in paragraphs 5-66 above, the government's
evidence will establish that TAJIK and GHAREKHANI conspired to
export defense articles, namely night vision equipment, from the
United States to the United Kingdom and ultimately to Iran,
knowing that they were violating United States law by doing so.
Moreover, the evidence demonstrates that TAJIK and GHAREKHANI
attempted to export these defense articles, with TAJIK meeting
with ICE undercover operatives in the United Kingdom to view a
sample of the merchandise and prove that he had money ready to
complete the transaction.

Statute of Limitations

77.  The statute of limitations applicable to the offenses
charged in counts 1 and 2 is Title 18, United States Code, §
3282, which allows prosecution to commence within five (5) years
after the offense is committed.  I have attached a copy of the
statute to this affidavit as exhibit D.  The complaint is dated
August 30, 2006, and each count charges and offense that

continued until August 30, 2006.  Therefore, the charges were filed within the prescribed time.

Description of Fugitive

78.  Nosratollah Tajik is a citizen of the Islamic Republic of Iran, born on November 19, 1953.  He holds Iranian passport number R4131983.  TAJIK is described as a male, with a height of approximately 5 feet, 6 inches, a weight of approximately 150 pounds, with black hair and a gray mustache and a beard.

79.  I have attached as Exhibit E to this affidavit a photograph of TAJIK that has been identified by two ICE undercover agents (UCA-1 and UCA-3) as the same individual they met with on August 17, 2006, in London, United Kingdom.

Location of Fugitive

80.  TAJIK is an Iranian national born on November 19, 1953. He  holds an Iranian passport.  He entered the United Kingdom as a student and is an academic researcher residing at 58 Beech Field Rise, Coxhoe, County Durham DH6 4SB.  Nosratollah TAJIK is a director of the private limited company UK Islamic Direct Business Limited located in Harrow, Middlesex, United Kingdom.

CONCLUSION

81.  I have thoroughly reviewed the government's evidence against Nosratollah Tajik and attest that this evidence indicates that TAJIK is guilty of the offenses charged in the complaint.

PATRICK J. FITZGERALD
United States Attorney


DANIEL RUBINSTEIN
Assistant United States Attorney


Signed and sworn to before me this 30th day of August,

2006, at Chicago, Illinois.


MICHAEL T. MASON
United States Magistrate Judge

## LIST OF EXHIBITS

Exhibit A        Certified copy of the complaint.

Exhibit B        Certified copy of the arrest warrant.

Exhibit C        Copy of the pertinent sections of the following

statutes and their penalties:

Title 22, United States Code, Section 2778

Title 22, Code of Federal Regulations,
Section 127.1

Exhibit D        Copy of the statute of limitations:

Title 18, United States Code, § 3282.

Exhibit E        Photograph of Nosratollah Tajik.

**EXHIBIT C**

<u>22 U.S.C.A. § 2778</u>. Control of arms exports and imports

(a) Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; negotiations information

(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

(b) Registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and defense services

(2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter, except that no license shall be required for exports or imports made by or for an agency of the United States Government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.

(c) Criminal violations; punishment
Any person who willfully violates any provision of this section or section 2779 of this title, or any rule or regulation issued under either section, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than ten years, or both.



GOVERNMENT EXHIBIT C

<u>Title 22 Code of Federal Regulations Section § 127.1</u>

§ 127.1 Violations.

(a) It is unlawful:

(1) To export or attempt to export from the United States, or to reexport or retransfer or attempt to reexport or retransfer from one foreign destination to another foreign destination by a U.S. person of any defense article or technical data or by anyone of any U.S. origin defense article or technical data or to furnish any defense service for which a license or written approval is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;

(3) To conspire to export, import, reexport or cause to be exported, imported or reexported, any defense article or to furnish any defense service for which a license or written approval is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;

(d) No person may knowingly or willfully cause, or aid, abet, counsel, demand, induce, procure or permit the commission of any act prohibited by, or the omission of any act prohibited by, or the omission of any act required by 22 U.S.C. 2778, 22 U.S.C. 2779, or any regulation, license, approval, or order issued thereunder.

**EXHIBIT D**

Title 18, United States Code Annotated Section 3282.
Offenses not capital

(a) In general.--Except as otherwise expressly provided by law,

no person shall be prosecuted, tried, or punished for any

offense, not capital, unless the indictment is found or the

information is instituted within five years next after such

offense shall have been committed.

GOVERNMENT
EXHIBIT

D



NOSRATOLLAH   TAJIK

19. NOV. 1953



GOVERNMENT
EXHIBIT

E